719 So.2d 104 (1998)
STATE of Louisiana, Appellee,
v.
Derrick MAXIE, Appellant.
No. 30877-KA.
Court of Appeal of Louisiana, Second Circuit.
August 19, 1998.
*106 J. Wilson Rambo, Monroe, Louisiana Appellate Project, for Appellant.
Richard Ieyoub, Attorney General, Don M. Burkett, District Attorney, Richard Z. Johnson, Jr., Assistant District Attorney, for Appellee.
Before MARVIN, C.J., and NORRIS and GASKINS, JJ.
GASKINS, Judge.
The defendant, Derrick Maxie, was found guilty by a jury of one count of attempted second degree murder and one count of armed robbery. The defendant was sentenced to serve twenty years at hard labor for the second degree murder conviction and fifteen years at hard labor, without benefit of parole, probation, or suspension of sentence, for the armed robbery conviction, with the sentences to be served consecutively. The defendant appeals his convictions and sentences. For the following reasons, we affirm the convictions, but vacate the sentences and remand for resentencing.

FACTS
On the evening of September 23, 1994, the defendant and several friends including Cedric Hewitt, Vyron Brooks, Steve Cooper and Johnny Wilbert decided to ride from Gloster, Louisiana to Mansfield, Louisiana. Initially, the group rode in two cars with the defendant riding in the car driven by Cedric Hewitt and the others riding in a car driven by Steve Cooper. After arriving in Mansfield, Steve Cooper stated he did not have a driver's license and therefore did not want to drive. Cedric Hewitt decided he would allow everyone to ride with him. At some point, the talk among the group turned to "jacking" someone and stealing stereo equipment. The group parked their car in Mansfield in an area known as "the projects."
As the group sat outside of the car socializing with others in the area, a car passed playing loud music and was flagged down by someone from the group. The driver of the car, Edward Simpson, stopped and then, realizing that he did not know the defendant and his group, tried to drive away. According to Mr. Simpson, one member of the group walked to the passenger side of his car with a gun. Then the defendant walked up to the driver's side and also aimed a gun at Mr. Simpson. According to the victim, the defendant ordered him from the vehicle and put a gun to the back of his head as he lay on the ground. The defendant was heard ordering the others to take the stereo equipment from the car. At some point, a struggle *107 ensued between the defendant and the victim. The driver of the car was able to escape, but not without being fired at by the defendant. Mr. Simpson fled, with the defendant pursuing him on foot. The defendant fired at the victim five or six times. The victim was injured and required stitches in his forehead, although it is not clear if he was injured by gunfire or during the struggle with the defendant. The defendant, Cedric Hewitt and Vyron Brooks were arrested and charged in this matter.
The defendant was tried by a jury. Cedric Hewitt and Vyron Brooks testified for the state and both were allowed to plead guilty to lesser charges of middle grade theft after testifying in this case. On May 27, 1994, the defendant was found guilty of attempted second degree murder and armed robbery.
After a motion for new trial was denied on September 9, 1994, the defendant was sentenced on November 16, 1994. At that time the defendant's trial counsel made an oral motion for an appeal and the trial judge requested the motion be followed by the appropriate orders for his signature. No orders were submitted by the trial attorney.
On August 22, 1997, the defendant filed a post-conviction relief application in the trial court seeking an out-of-time appeal and reconsideration of his sentence. The trial court granted the out-of-time appeal. The court also deemed the motion to reconsider sentence timely however, the motion was denied. On appeal, the defendant claims there was insufficient evidence upon which to base his conviction, that the sentences imposed are excessive, that the trial court failed to adequately state the factors considered in imposing sentence as required by La. C.Cr.P. art. 894.1 and erred in failing to adequately articulate reasons for ordering the sentences to be served consecutively rather than concurrently.

SUFFICIENCY OF THE EVIDENCE
The defendant argues that there was insufficient evidence upon which to base his conviction of attempted second degree murder. The defendant asserts that the state failed to present sufficient evidence to prove he had the specific intent to kill the victim and thus, he could only be convicted of a lesser included offense. The defendant contends this case should be remanded to the trial court for a new trial or this court should enter a judgment of conviction for aggravated battery. The defendant does not argue the sufficiency of the evidence to convict him of armed robbery.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the proper standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La. App. 2d Cir.), writ denied, 605 So.2d 1089 (1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Lott, 535 So.2d 963 (La.App. 2d Cir.1988).
La. R.S. 14:30.1(A) defines second degree murder, in pertinent part, as:
the killing of a human being: (1) when the offender has a specific intent to kill or to inflict great bodily harm; or (2) is engaged in the perpetration or attempted perpetration of armed robbery.
See also State v. Harper, 27,278 (La.App.2d Cir.8/23/95), 660 So.2d 537, writ denied 95-2318 (La.1/12/96), 666 So.2d 320.
La. R.S. art. 14:27 defines attempt, in part, as:
any person who, having specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward *108 the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether under the circumstances, he would have actually accomplished his purpose.
Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). Specific intent is a state of mind and, as such, need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Graham, 420 So.2d 1126 (La.1982).
Specific intent to commit a crime is an element of an attempted offense. (La. R.S. 14:27). Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. La. R.S. 14:10, 14:27. See State v. Parish, 405 So.2d 1080 (La.1981).
The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Huizar, 414 So.2d 741 (La.1982); State v. Butler, 322 So.2d 189 (La.1975). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, supra; State v. Butler, supra; State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, supra; State v. Huizar, supra.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. V, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (1987).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Ford, 28,724 (La.App.2d Cir. 10/30/96), 682 So.2d 847; State v. Brown, 29,708 (La.App.2d Cir.9/24/97), 702 So.2d 744, writ denied 97-2549 (La.1/30/98), 709 So.2d 703.
In the present case, the record shows that there was sufficient evidence presented to the jury upon which it could conclude beyond a reasonable doubt that the defendant possessed the requisite specific intent to kill the victim, Edward Simpson. Mr. Simpson testified at the trial that on September 23, 1993, he was driving in a white Mustang with the music playing loudly. After someone flagged him down, Mr. Simpson pulled over to see if he knew the person. After being unable to recognize the person, Mr. Simpson was attempting to back out of the driveway when someone put a gun up to his passenger window. As he looked around, the defendant, who Mr. Simpson identified in court, pulled a gun on the driver's side of the car. The defendant ordered Mr. Simpson out of the car, and then opened the door and pulled Mr. Simpson from the car, throwing him to the ground.
After throwing Mr. Simpson to the ground, the defendant got on top of him and put the gun behind his head. Mr. Simpson recalled the defendant saying "And [he] told me I better not look back, if I look back he'll blow my brains out, you know." The defendant ordered his cohorts to take the stereo equipment from Mr. Simpson's car. While holding Mr. Simpson down, the defendant took a wallet from the victim's back pocket. As he got off Mr. Simpson, the defendant started adjusting the bandana that was concealing his mouth. At this point, Mr. Simpson, fearing he would be killed if he remained, *109 jumped up and kicked the defendant to give himself the opportunity to escape. The gun fell to the ground and Mr. Simpson fled.
As he started running, Mr. Simpson heard someone say, "don't shoot him, don't kill him, man." Mr. Simpson stated he ran a long way with the defendant in pursuit. The defendant fired five or six shots during the chase. Mr. Simpson recalled he was able to escape the defendant by running into a house he saw open. Once inside the house, Mr. Simpson realized he was bleeding from his forehead. The occupant of the house called for an ambulance. Mr. Simpson was taken to DeSoto General Hospital where he was treated and released. Mr. Simpson now has a scar on his forehead. During the trial, Mr. Simpson testified that he was not intoxicated at the time the incident occurred; however, other witnesses stated that Mr. Simpson was indeed intoxicated at that time.
Mr. Simpson stated he was sure the defendant was firing the shots at him despite the fact that at least one other person had a gun at the time. Mr. Simpson was also certain that the defendant gave the order to take the stereo equipment from his car. He did not see who actually removed the stereo equipment from the car.
Johnny Wilbert testified he was at his cousin's home when the defendant and a group of men came over for a visit. The group included Cedric Hewitt, Vyron Brooks, and at least two other individuals. As the group chatted, they began to talk about trying to rob someone. Mr. Wilbert stated that the defendant and Cedric Hewitt were the main instigators of this conversation. The group rode around for some time, then transferred to Cedric Hewitt's car. They then rode to the projects where they parked in a parking lot.
According to Mr. Wilbert, the victim was drunk and kept driving by, shining his car lights on the group. The defendant announced that "it's time we're going to get him." The defendant and Cedric Hewitt walked up to the car and pulled guns on the victim. Mr. Simpson was ordered out of the car and as the defendant walked Mr. Simpson away from the car, Cedric Hewitt began taking property from the car.
The defendant ordered Mr. Simpson to get on the ground and a struggle ensued in which the witness believed the defendant struck Mr. Simpson. While the witness did not actually see the defendant strike Mr. Simpson, he stated he heard a loud popping sound that made him believe Mr. Simpson had been hit. The witness recalled that he watched most of the event from behind an apartment building which he stated was approximately five feet from where the cars were parked and thus he could see what was going on at the victim's car.
The day after the incident, another group including Johnny Wilbert and the defendant, were at a local store where they were talking. Mr. Wilbert recalled "And Derrick, he was telling this, how he tried to get him and stuff, how he tried to kill him and stuff like that." The defendant also told the group that he hid the gun used in the incident in the woods behind his house.
James Sudds testified he was in the projects on September 23 when the defendant ran up to his truck with a gun and said "What's wrong with you, fool" or "What's up, fool." At some point, Cedric Hewitt walked over to the truck and told the defendant he knew Mr. Sudds and he was "cool." According to Mr. Sudds, Cedric Hewitt walked away from the truck, but the defendant remained. Cedric Hewitt returned to the truck and again told the defendant he knew Mr. Sudds. The defendant then walked away from the truck and the group left the area in a car.
Vyron Brooks, who was also charged in this incident, testified he had entered into a plea agreement with the state for his testimony whereby he would be allowed to plead guilty to one count of middle grade theft. Mr. Brooks testified that he was in the group of men including Cedric Hewitt and the defendant on the evening of September 23, 1994. The group was congregated in a parking lot in Mansfield. Mr. Brooks stated that he saw the defendant waving a gun. After the car driven by Mr. Simpson passed the group, the defendant told them he was going to get the car. When Mr. Brooks protested this idea, the defendant began berating him.
*110 After Mr. Simpson began backing his car up, the defendant said "Man, he's messing with me, he's messing with me. I got to get him. I got to get him." The defendant then ran to the car and pulled the gun out while ordering Mr. Simpson from the car. Mr. Brooks testified the defendant walked Mr. Simpson to a grassy area where the victim was ordered to lie on the ground. A struggle ensued between Mr. Simpson and the defendant, and the defendant struck the victim in the head with the gun. Mr. Simpson then ran away as the defendant fired shots at him.
According to Mr. Brooks, during the altercation between Mr. Simpson and the defendant, Cedric Hewitt took the stereo equipment from Mr. Simpson's car. Mr. Brooks helped load the stereo equipment into Cedric Hewitt's car. When the group was ready to leave the area, the defendant was still "running around out there." Mr. Brooks testified as they were about to leave the defendant, the truck driven by Mr. Sudds came upon the scene. Mr. Sudds got of the car and asked what was going on, when the defendant pulled the gun on him. After finally getting the defendant into the car, the group drove away. Mr. Brooks was arrested later that morning.
Cedric Hewitt also testified pursuant to a plea agreement. Cedric stated that he, Steve Cooper, Vyron Brooks, Johnny Wilbert and the defendant decided to go riding to Mansfield. Cedric drove his own car. Once they arrived in Mansfield, it was discovered that Steve Cooper did not have a driver's license; therefore, the entire group rode around in Cedric Hewitt's car. The group decided to park in a parking lot where they got out and began talking.
According to Cedric Hewitt, the defendant began talking about "doing a jack" and when the group protested, the defendant told them he was joking. When Mr. Simpson drove up, the defendant went to his car window and began talking. Unexpectedly, the defendant pulled out a gun and ordered Mr. Simpson from the car. The witness stated he did not see the defendant hit Mr. Simpson or take his wallet. Cedric Hewitt stated that he did see the defendant running after Mr. Simpson and the defendant fired his gun.
When the defendant returned from chasing Mr. Simpson, he went up to Mr. Sudds' truck and pointed the gun at him. Cedric Hewitt stated he told the defendant he knew Mr. Sudds and to leave him alone. According to Cedric Hewitt, the defendant attempted to fire the gun at Mr. Sudds but the gun only clicked. Cedric Hewitt stated that Vyron Brooks was able to get the defendant into the vehicle and the group left the scene.
During the ride home, the defendant showed Cedric Hewitt the wallet he had taken from Mr. Simpson. As they were driving away from the scene of the crime, the defendant had blood on his hands. According to Cedric Hewitt, the defendant claimed the blood came from hitting Mr. Simpson in the head with the gun, not striking him with a bullet while shooting at him. Cedric recalled the defendant saying, "I hit him with the gun. I was shooting at him. I was trying to kill him."
Cedric Hewitt claimed that he wanted to return the stereo equipment, but the defendant stated he wanted to keep something and took the amplifier that was attached to the speakers. That night, the police stopped Cedric Hewitt and recovered the speakers from the car. A gun was also recovered from Cedric Hewitt's apartment.
At trial, The defendant testified on his own behalf and offered a version of the events which is contradictory to the testimony of all the other witnesses. According to the defendant, Cedric Hewitt was the main instigator of these offenses. The defendant denied involvement in the robbery and attempted murder of Mr. Simpson. The defendant testified that Cedric Hewitt announced on the ride from Gloster to Mansfield his intent to steal some speakers for his car and Cedric Hewitt showed the defendant two guns during the ride. The defendant stated he was only a bystander as Cedric Hewitt pulled the gun on Mr. Simpson. The defendant also testified that he did help remove the speakers from the car and place them in Cedric Hewitt's car. The defendant maintained he did not have a car and thus had no need for the car speakers. The defendant asserted *111 his cohorts were lying in an attempt to get released from jail.
This record shows that the prosecution presented ample evidence to prove that the defendant possessed the requisite specific intent to kill Mr. Simpson and, by repeatedly firing a gun at him, performed an overt act tending toward the accomplishment of that goal. Further, the positive identification of the defendant as the perpetrator of this offense by the victim and the other witnesses is sufficient to show that the defendant, not Cedric Hewitt, attempted to kill the victim. The testimony presented by the victim and co-defendants established that the defendant pulled the victim from his car in an attempt to steal the victim's stereo equipment. The defendant was armed with a gun which he placed to the back of the victim's head. The defendant told the victim he would be killed if he looked back at the defendant. Fearing he would be killed, the victim kicked the defendant in an attempt to escape. As the victim fled, the defendant pursued him, firing five to six shots. At some point, the victim was injured either by a gunshot or from being hit in the head with the gun by the defendant. The defendant later told his cohorts that he was attempting to kill the victim.
From the actions of the defendant, it was reasonable for the jury to conclude that the defendant was indeed attempting to kill the victim during the robbery. While the defendant denied he was involved in trying to kill the victim, the jury obviously chose to believe the testimony of the victim and the other witnesses. Great deference should be afforded the jury's decision to reject the testimony and make credibility determinations. The defendant's argument that there is insufficient evidence to support his conviction for attempted second degree murder is without merit.

EXCESSIVE SENTENCES
The defendant argues that the trial court erred in imposing excessive sentences upon him and erred in failing to adequately articulate for the record the considerations for the sentences imposed, as required by La.C.Cr.P. art. 894.1.
A trial court has wide discretion to sentence within the statutory limits. Absent a showing of manifest abuse of discretion, this court does not set aside a sentence as excessive. State v. Square, 433 So.2d 104 (La.1983); State v. Henton, 28,576 (La. App.2d Cir.9/25/96), 682 So.2d 777, writ denied 96-2590 (La.3/27/97), 692 So.2d 391; State v. Washington, 29,478 (La.App.2d Cir.4/2/97), 691 So.2d 345.
The Louisiana Felony Sentencing Guidelines were in effect in this state from January 1, 1992 until August 15, 1995, and were applicable when the defendant was sentenced on November 16, 1994. Under the guidelines, when a trial judge sentences within the designated sentence range on the sentencing grid, he need only put on the record the sentence, the proper grid cell for the sentence imposed, and how he determined the cell was the proper cell to be used. La. S.G. § 201(B) and (C). State v. Barnes, 607 So.2d 872 (La.App. 2d Cir.1992).
In the present case, although the trial judge did not specifically state the proper grid cell, according to the guidelines report, the proper grid cell would be 1B. This correctly corresponds to the recommended sentencing ranges mentioned by the trial judge during the sentencing. During the very brief sentencing hearing, the trial judge stated that he found the incidents fit the typical case for which the guidelines were intended. The trial court noted that the defendant was a first felony offender with an extensive juvenile record and several misdemeanor adjudications which were detailed in the guideline report. The sentencing guideline report indicated the defendant had seven juvenile adjudications (three of which were felonies) for offenses of theft, drunk in public, party to theft, party to a crime/attempted theft, operating a vehicle without owner's consent, and attempted operation of vehicle without owner's consent. The defendant was sentenced to 20 years at hard labor for the attempted second degree murder charge, and 15 years at hard labor without the benefit of probation, parole or suspension of sentence for the armed robbery charge. The trial judge ordered the sentences be served consecutively.
*112 The sentencing guidelines recommended 405-435 months (approximately 33¾ years to 36¼ years) for the consecutive sentences in this case. The defendant's argument regarding this portion of his excessive sentence is without merit. The trial judge sentenced the defendant within the designated range provided by the sentencing guidelines. The individual sentences for the respective crimes are not excessive. However, as stated below, the trial court failed to adequately support on the record its reasons for ordering that the sentences be served consecutively.

CONSECUTIVE SENTENCES
The defendant argues trial court error in ordering that the sentences imposed in this case be served consecutively. He contends that these offenses arose out of a single course of conduct and the trial court was required to set forth on the record particular justification for imposing consecutive sentences. He contends that the trial court failed to set forth sufficient reasons for the imposition of consecutive sentences in this case. We find that this assignment of error has merit.
La.C.Cr.P. art. 883 provides:
If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.
The Louisiana Felony Sentencing Guidelines continued the statutory suggestion that concurrent sentences should be imposed if two or more criminal acts constitute parts of a common scheme. La. S.G. § 215(A)2. While the word "should" was not mandatory, the guidelines clearly suggested that a trial court specifically consider several aggravating factors which may warrant imposition of consecutive sentences. State v. Norrell, 614 So.2d 755 (La.App. 2d Cir.1993).
Concurrent sentences arising out of a single cause of conduct are not mandatory and consecutive sentences under those circumstances are not necessarily excessive. State v. Pickett, 628 So.2d 1333 (La.App. 2d Cir.1993); State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985); State v. Ortego, 382 So.2d 921 (La.1980), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Williams, 445 So.2d 1171 (La.1984); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.), writ denied, 508 So.2d 65 (1987). It is within a trial court's discretion to order sentences to run consecutively rather than concurrently. State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La.1988); State v. McCray, 28,531 (La. App.2d Cir.8/21/96), 679 So.2d 543. All factors in the case are to be considered in choosing whether to impose consecutive or concurrent sentences. State v. Ortego, supra; State v. Derry, supra; and State v. Beverly, 448 So.2d 792 (La.App. 2d Cir.), writ denied, 450 So.2d 951 (1984). Among the factors to be considered are the defendant's criminal history, the gravity or dangerousness of the offense, the viciousness of the crimes, the harm done to the victims, whether the defendant constitutes an unusual risk of danger to the public, defendant's apparent disregard for the property of others, the potential for defendant's rehabilitation, and whether defendant has received a benefit from a plea bargain. State v. Wilson, 28,403 (La.App.2d Cir.8/21/96), 679 So.2d 963; State v. Smith, 26,661 (La.App.2d Cir.3/1/95), 651 So.2d 890, writs denied 95-0918 (La.9/15/95), 660 So.2d 458; 95-0995 (La.1/29/97), 687 So.2d 378; 95-1598 (La.2/7/97), 688 So.2d 493.
A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Strother, 606 So.2d 891 (La.App. 2d Cir.1992), writ denied 612 So.2d 55 (La.1993); State v. Mims, 550 So.2d 760 (La.App. 2d Cir.1989), appeal after remand, 566 So.2d 661 (La.App. 2d Cir.), writ denied, 569 So.2d 970 *113 (1990); State v. Thompson, 543 So.2d 1077 (La.App. 2d Cir.), writ denied, 551 So.2d 1335 (1989); State v. Lighten, 516 So.2d 1266 (La. App. 2d Cir.1987). When consecutive sentences are imposed, the court shall state the factors considered and its reasons for the consecutive terms. State v. Green, 614 So.2d 758 (La.App. 2d Cir.1993).
While within its discretion to order the sentences to be served consecutively, in this case the trial court did not provide adequate reasons on the record for imposition of the consecutive sentences.
The sentencing judge noted that the defendant had an extensive juvenile record and had several misdemeanor adjudications. Further, In imposing these sentences, the trial court stated:
The court adopts the guidelines finding that they are factually correct and do describe the incidents that fit within the typical case for which the guidelines were intended. Term of incarceration, this court believes is not excessive although the court is going to impose consecutive treatment and with the maximum range of the guidelines, the upper end range of the guidelines.
The trial judge stated that the defendant's crimes were of a typical nature, but then sentenced the defendant to the upper range of consecutive sentences. The record shows that the trial judge did not articulate the factors taken into account to determine the defendant's sentence. Because the trial court failed to state its reasons for the imposition of the instant consecutive sentences, we are not able to review this argument fully to determine whether the imposition of consecutive sentences is excessive. While we do not, on the face of the record before us, find that the imposition of consecutive sentences arising out of a single course of conduct is necessarily excessive, we remand for the trial court's resentencing and articulation under La.C.Cr.P. arts. 894.1 and 883.

CONCLUSION
For the reasons assigned, the defendant's convictions are affirmed. The sentences are vacated and the case is remanded for resentencing with a full statement of the reasons for the particular sentences imposed.
CONVICTIONS AFFIRMED; SENTENCES VACATED; REMANDED FOR RESENTENCING.