543 So.2d 1077 (1989)
STATE of Louisiana, Appellee,
v.
Ted B. THOMPSON, Appellant.
No. 20483-KA.
Court of Appeal of Louisiana, Second Circuit.
May 10, 1989.
Rehearing Denied June 1, 1989.
*1078 Milton Dale Peacock, Monroe, Don Ervin, Houston, Tex., for appellant.
William J. Guste, Jr., Atty. Gen., Baton Rouge, James A. Norris, Jr., Dist. Atty., Marcus R. Clark, Asst. Dist. Atty., Monroe, for appellee.
Before HALL, MARVIN and FRED W. JONES, Jr., JJ.
MARVIN, Judge.
Pleading guilty with a Crosby reservation to the crimes of possession of 260 pounds of marijuana and of conspiracy to distribute marijuana, defendant appeals the denial of his motion to suppress the marijuana which was seized from his pickup after he was stopped for a traffic violation. He also complains that his sentences, which total 13½ years at hard labor, plus default time if fines are not paid, should not have been made consecutive because he is a first felony offender and the crimes arose out of a single course of conduct.
We affirm.

FACTS
On September 23, 1987, State Trooper Coleman, on routine highway patrol on I-20 in Ouachita Parish, saw a pickup ahead of him weaving from its lane of travel into the adjacent lane and onto the shoulder. After observing this for about two miles, Coleman, using his emergency lights, signaled the truck driver to pull over. The driver, Ted B. Thompson, continued driving at the same speed, and weaving, for another four miles.
Coleman then pulled up beside Thompson and motioned him to pull over at 6:20 p.m. Thompson followed Coleman's instructions to exit his truck and approach the trooper's car. Thompson apologized for not stopping sooner even though Coleman had not said anything to him about following and signalling him for four miles.
*1079 Coleman asked Thompson for his driver's license, noticing that Thompson was breathing rapidly and his hands were shaking as he tried to get his license out of his wallet. Coleman also said he could see from the blood vessels in Thompson's neck that his heart was "beating pretty fast." Coleman acknowledged that most people are nervous when they are stopped by a state trooper but said Thompson was "overly" or "extremely" nervous.
Thompson, a resident of Atlanta, Georgia, did not have a driver's license but had two papers indicating that he had completed a driver improvement program after his license was suspended for a Georgia DWI conviction. At Coleman's request, Thompson produced the truck's registration from his wallet.
Coleman walked to the front of the truck to verify the VIN on the registration form. A camper shell covered the cargo bed of the truck but did not prevent Coleman from seeing that the bed contained numerous cardboard boxes, taped shut. Coleman then walked to the truck's tailgate, where he smelled a deodorizing agent he described as either fabric softener or air freshener. He explained that five years of experience in traffic stops and drug arrests had taught him that these aromas were sometimes used in an attempt to mask the odor of marijuana.
Each time Coleman neared the truck Thompson placed himself between Coleman and the truck. Coleman perceived this as an attempt to keep him away from the truck, acknowledging, however, that Thompson may have been trying only to keep in front of him as the two conversed.
Coleman then had Thompson accompany him to the patrol unit. Coleman verified by radio contact with troop headquarters that Thompson's driver's license was no longer suspended and that his criminal record consisted only of traffic offenses. Coleman wrote Thompson a ticket for improper lane usage and asked him what was in the taped boxes in the back of the truck. Thompson answered, "personal belongings." The recited sequence of events took about 10 minutes.
Coleman then told Thompson at 6:30 p.m. he suspected there was contraband in the truck and asked if Thompson would sign a consent to search form Coleman was completing with date and time. Within a few minutes and after some discussion, Thompson refused to consent to the search. Coleman told him he was going to hold the truck and call headquarters for a drug detection dog. Coleman did so at 6:36 p.m. At 6:45 p.m. Coleman was told by his headquarters that a dog was en route. Five minutes later, a Metro narcotics officer arrived, confirming to Coleman that a dog was en route.
A second Metro narcotics officer arrived at 7:06 p.m. with his dog. The dog was trained to detect marijuana, hashish, cocaine and heroin. At 7:08 p.m. the dog alerted on the truck's tailgate. At 7:12 p.m., a West Monroe police officer arrived with a second and similarly trained dog. The second dog alerted on the truck's tailgate at 7:14 p.m.
Coleman and his superior, Sgt. Cannon, then asked Thompson for the keys to the truck. Thompson initially refused to give them the keys without a search warrant, but soon agreed. Coleman unlocked the truck's tailgate at 7:28 p.m. He counted 26 cardboard boxes taped shut. He opened one box and found a plastic bag containing vegetable matter later identified as marijuana. At 7:31 p.m. Thompson was arrested for possession of marijuana and was later charged with possessing 260 pounds.

MOTION TO SUPPRESS
Thompson concedes he was lawfully stopped for a traffic violation but contends he was unlawfully and unreasonably detained after being given the traffic ticket. He argues there were no articulable facts to support Trooper Coleman's suspicion that there was contraband in the truck. Thompson contends in the alternative that his detention was unreasonably long even if based on a suspicion that was reasonable.
Thompson's detention must be based on reasonable suspicion that he has been, is, *1080 or is about to be engaged in criminal conduct. CCrP Art. 215.1. Reasonable cause for such detention has been said to be something less than probable cause and is to be assessed according to the totality of the facts and circumstances known to the police officer, from which in retrospect, it can be determined whether an infringement on the individual's right to be free from governmental interference was constitutionally permissible. See State v. Belton, 441 So.2d 1195 (La.1983), U.S. cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543.
Belton recognizes that flight, nervousness or a startled response to the sight of a police officer is, of itself, insufficient to justify an investigatory stop, but nevertheless may be "highly suspicious" and may be considered along with other facts and circumstances in the reasonable cause inquiry. 441 So.2d at 1198. The officer's experience "on the street" also may be considered in assessing whether he made reasonable inferences from the facts at hand. State v. Meyers, 520 So.2d 842, 845 (La.App. 3d Cir.1987).
The trial court gave these reasons for denying the motion to suppress:
In this case whereas the simple word "nervousness" or some state simply called nervousness is called a subjective observation[,] the physical manifestations which are frequently associated with that term are objective manifestations which the officer described here. The movements of the vehicle creating a substantial hazard on the highway ... the unusual circumstances about the defendant's driver's license ... the movements of the defendant between the officer and the vehicle ... the appearance of the boxes, not in the cab of the vehicle but in the covered bed of the pickup truck ... [and] the defendant's apologies for some of his actions are objective manifestations.
When the Court puts all of these together, any single one of them is, of course, insufficient to establish reasonable suspicion that there is something in that vehicle which this defendant does not wish to disclose or does not wish to be discovered. Add all those objective manifestations to the deodorizing agent in the back of the truck, not in the cab of the vehicle where the parties ride, and the Court finds reasonable suspicion that there may well be contraband in the vehicle. From that point on, the totality of the circumstances and the exigent circumstances on the highway with the vehicle convince the Court that it was a reasonable stop, detention, search, seizure and arrest.
We agree that the combination of Thompson's behavior and the smell of air freshener in the back of the truck where the sealed boxes were located gave Coleman reasonable, articulable suspicion that the truck contained contraband, even though he did not smell marijuana in or around the truck.
Coleman recalled at least 20 prior arrests involving large quantities of marijuana where air freshener or a similar deodorizing substance had been used to try to mask the smell of the drug. He acknowledged that air freshener is often used in vehicles that are not carrying drugs but explained that in those instances the smell comes from the occupied area of the vehicle and not from the cargo bed of a pickup. See and compare State v. Garcia, 519 So.2d 788 (La.App. 1st Cir.1987), writ denied.
In Garcia, the smell of marijuana coming from a pickup stopped for traffic violations was found to be one factor establishing probable cause for the warrantless search of the truck. The court stated, at p. 793, that "there is no reasonable expectation of privacy from lawfully positioned officers with inquisitive nostrils."
Thompson relies on State v. Bunnell, 517 So.2d 439 (La.App. 1st Cir.1987), where marijuana that was found in a consent search of a car stopped for speeding was suppressed because the state trooper detained the car driver and passenger well beyond the time deemed reasonable to investigate the traffic violation. The detention was found to be for the sole purpose of obtaining a consent to search the car. The trooper had only a generalized suspicion *1081 about the occupants which was based primarily on their nervousness and the fact that they had Florida driver's licenses and were driving a car registered in New York. The trooper testified "that he was not suspicious of their involvement in a particular crime, but, rather, just suspicious." He said he wanted to search the car because he "[knew] of a lot of crimes that go on on the interstate." 517 So.2d at 440, 441.
In contrast, Trooper Coleman specifically suspected that Thompson's truck contained marijuana or other illegal drugs, not only because of his observations of Thompson's behavior, but because of the smell of a deodorizing agent in the back of the truck which he had associated with drug trafficking during his five years of experience. Coleman had a particularized suspicion based on articulable facts, and not merely a generalized suspicion or hunch that Thompson was involved in some unspecified type of illegal activity.
The more pertinent inquiry is whether Coleman diligently pursued a means of investigation that was likely to quickly confirm or dispel his particular suspicion about the contents in the taped boxes in the truck. U.S. v. Sharpe, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985).
Sharpe recognizes that a detention, founded on reasonable cause, may become an unreasonable intrusion under the Fourth Amendment if it extends beyond the time necessary for reasonably diligent and legitimate police investigation. The reasonableness of the delay is not subject to a bright-line rule according to the number of minutes involved, but is assessed in the light of the officer's diligence under the circumstances which confronted the officer.
In Sharpe, a DEA agent and a highway patrol officer stopped a car and a pickup traveling in tandem, reasonably suspecting that the vehicles were involved in drug trafficking. See fn. 3, 105 S.Ct. at 1573. The truck driver, Savage, was detained for 20 minutes while the officers moved between the two vehicles that were stopped about one-half mile apart. They examined Savage's driver's license and the truck's bill of sale, unsuccessfully sought permission to search the truck, and confirmed their suspicion that the truck was probably overloaded by stepping on the rear bumper. After taking these steps, one of the officers detected the smell of marijuana at the rear window of the camper shell covering the truck's bed, took the keys from the ignition, opened the camper, and found bales of marijuana wrapped in burlap. Concluding that the officers diligently and quickly dealt with the demands of the situation, the court found the 20-minute detention reasonable.
The court in Sharpe distinguished U.S. v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). There, Place, an airline passenger, and his luggage were detained for 90 minutes while the police arranged for the luggage to be subjected to a canine sniff test. Although the police had reasonable cause to detain and investigate the luggage, the court found the detention was unreasonably lengthy because the police knew in advance from authorities in another city when Place would be arriving with the suspicious luggage but did not take steps to arrange the sniff test until after Place's arrival. On these facts, the court found the police did not diligently pursue their investigation.
Trooper Coleman testified that he was not suspicious of the truck's contents before he stopped Thompson for weaving on the highway. His suspicions arose after he made the stop and before he ticketed Thompson for improper lane usage about 10 minutes later. After smelling the deodorizer, Coleman requested consent to search the truck at 6:30 p.m. Thompson refused consent at 6:35 p.m. At 6:36 p.m. Coleman radioed his request to troop headquarters for a drug detection dog. He received two confirmations that dogs were en route by 6:50 p.m. An officer arrived with the first dog at 7:06 p.m. The second dog arrived at 7:12 p.m. Each sniff test was completed within two minutes of the dog's arrival. The 14-minute delay between completion of the second sniff test at 7:14 p.m. and Coleman's search of the truck at 7:28 p.m. was caused by Thompson's *1082 refusal to surrender the keys without a search warrant.
Thompson was formally arrested at 7:31 p.m., about an hour after Coleman inquired about the contents of the taped boxes in the truck. The delay between Thompson's refusal to consent to a search and the arrival of the first drug detection dog was about 30 minutes. The two sniff tests were conducted within ten minutes.
Canine sniff tests have been recognized as more discriminating and less intrusive than traditional searches because only the presence of contraband is revealed and other items are not exposed to public view. See U.S. v. Place, supra, 103 S.Ct. at 2644.
We find that Trooper Coleman diligently pursued his investigation in a manner that was likely to quickly confirm or dispel his suspicions. The cause, method and duration of Thompson's detention was reasonable. U.S. v. Sharpe, supra; State v. Fauria, 393 So.2d 688 (La.1981).
When two drug detection dogs had alerted on the truck's tailgate, probable cause existed for the officers to search Thompson's truck and the contents of the taped boxes in the truck without a warrant. U.S. v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); State v. Tatum, 466 So.2d 29 (La.1985).
The motion to suppress was properly denied.

SENTENCE
Thompson, age 39 at sentencing, whose only conviction was for the 1986 Georgia DWI, had a history of frequent drug and alcohol use. According to the PSI report, he began smoking marijuana and drinking alcohol at age 18, while in the military service, and he admitted being a "closet alcoholic." In his pre-sentence interview, he said he averages smoking two marijuana cigarettes and drinking four beers and two mixed drinks each day. At sentencing he stated he still uses marijuana occasionally and said he had "a grip" on his problem with alcohol. He admitted having used cocaine in the past but said he no longer uses it.
Thompson was honorably discharged from military service and has a high school education. His employment since then has been sporadic for reasons not determined. When sentenced, he had been working for six months as the manager of a black and white film processing laboratory near Atlanta. His employer considered him an excellent employee and wanted him to continue working at the lab.
Divorced in 1980, Thompson has a 15-year-old son who lives with Thompson's ex-wife. Thompson has not been ordered to pay child support, but does so "as he can."
Thompson said he was paid $1,000 to pick up the 260 pounds of marijuana in Houston and was to be paid an additional $2,000 when he delivered it in Atlanta. According to the state trooper who interviewed him after his arrest, he showed no remorse and refused to discuss his personal history or identify others involved in the distribution scheme.
The trial court found that Thompson's conduct was motivated solely by his desire for financial gain and that his conduct threatened serious harm to the ultimate consumers of the drug. The court noted that the legislature had recently increased the penalty for distribution of marijuana from 0-10 years plus a fine of up to $15,000, to 5-30 years, with the same fine. For conspiracy to distribute, Thompson was exposed to 2½ to 15 years and a $7,500 fine. LRS 14:26, 40:966 B(2). He was sentenced to six years at hard labor and was fined $7,500.
Thompson faced 5-15 years, without eligibility for parole, probation or suspension of sentence for five years, plus a fine of $25,000-$50,000, for possessing more than 60 pounds of marijuana. § 966 E(1), F(1). He received 7½ years at hard labor, the first five without benefit, to be served consecutively with the conspiracy sentence, and was fined $35,000. The court ordered an additional year of imprisonment as default time in the event either of the two fines was not paid.
*1083 The court stated the sentence would have been "much worse" but for mitigating factors that included Thompson's first felony offender status, his gainful employment, and the absence of any evidence that he was involved in drug trafficking after his arrest. Considering the large amount of marijuana involved in interstate trafficking and Thompson's history of alcohol and drug use, the court found that he was in need of confinement and that a lesser sentence would deprecate the seriousness of the offenses.
Thompson contends that consecutive sentences, totaling 13½ years without the additional two years of default time, are excessive for a first felony offender whose convictions arose out of a single course of conduct.
CCrP Art. 883 directs that sentences for offenses based on the same act or transaction, or constituting parts of a common scheme or plan, are to be served concurrently unless the court expressly directs that some or all be served consecutively. If the defendant has no previous criminal record, and does not present an unusual risk to public safety, concurrent sentences are favored over consecutive sentences for convictions arising out of a single course of criminal conduct. State v. Underwood, 353 So.2d 1013 (La.1977).
The fact that multiple convictions result from a single course of conduct does not, of itself, require concurrent sentences. If consecutive sentences are imposed, they must be particularly justified by the court, based on a consideration of the sentencing factors of CCrP Art. 894.1 as well as the degree of risk that the defendant poses to public safety. State v. Tomlin, 478 So.2d 622 (La.App. 2d Cir.1985).
Consecutive sentences for three marijuana sales over a two-month period were reviewed in State v. Underwood, supra. The first sale involved ten lids, or less than one pound; the second, 20 lids; and the third, 53 pounds. Underwood was initially sentenced consecutively to seven, eight, and ten years. The supreme court vacated these sentences as apparently excessive because the record did not justify consecutive sentences for sales to the same undercover officer over a short period of time by "a businessman of settled family without previous criminal record." 353 So. 2d at 1019.
After remand, however, the same court affirmed consecutive sentences of four, six and ten years, for a total of 20 years. State v. Underwood, 365 So.2d 1339 (La. 1978). In the second appeal the record contained the trial testimony of the undercover officer that was not made part of the record in the first appeal. The officer's testimony supported the sentencing court's conclusion that Underwood was a substantial supplier of marijuana, with a well-organized, profit-seeking operation.
"The judge ... opined that a lesser sentence would not only enhance the risk of future drug dealings but would grossly deprecate the seriousness of the defendant's crimes.... Underwood acted of his own volition and ... while [he] had no prior criminal record, it could not be learned how long he had pursued his drug enterprises without detection prior to his contact with [the undercover officer]." 365 So.2d at 1344.
The court here likewise weighed Thompson's lack of a prior record against his admitted regular use of marijuana over the past 20 years and his voluntary, profit-motivated participation in interstate transportation of 260 pounds of marijuana. The court deemed Thompson's conduct to pose an unusual risk to public safety, and noted the legislature's recent increase of penalties for distribution of marijuana. Thompson received no more than half of the 15-year maximum sentence for each offense, 6 and 7½ years respectively, for conspiracy to distribute and for possession of more than 60 pounds of marijuana.
We find the sentences to be particularized, justified as consecutive sentences, and not shockingly disproportionate to the seriousness of Thompson's criminal conduct.

DECREE
The convictions and sentences are AFFIRMED.

*1084 ON APPLICATION FOR REHEARING
HALL, MARVIN, FRED W. JONES, Jr., SEXTON and HIGHTOWER, JJ.
Rehearing denied.