hDREW, J.
Following a jury trial at which the defendant, Corinthians Milton, was convicted of attempted second degree murder and armed robbery, the defendant was billed as a second felony offender and convicted of same. The trial court sentenced defendant to 100 years at hard labor without the benefit of parole, probation, or suspension of sentence on the armed robbery conviction (the conviction used to enhance the second felony offender bill) and sentenced him to 50 years at hard labor without the benefit of parole, probation or suspension of sentence on the attempted second degree murder conviction. On appeal, the defendant asserted that the evidence was insufficient to support his convictions, that the sentences were excessive, that the trial court erred in denying his motion for reconsideration and that the trial court failed to adequately comply with La.C.Cr.P. art. 894.Í. For the following reasons, the convictions and sentences are affirmed.
TESTIMONY AND PROCEDURAL BACKGROUND

State’s Case in Chief

Gregory Lampkin

The victim, Gregory Lampkin, testified that he returned to his home at 1502 Martha Street in the Stoner Hill area at approximately 12:30 a.m. on March 16, 1998. After going inside and taking a bath, he then decided to go back out to the store. When he returned home approximately ten minutes later, he decided to park his pickup truck in his garage. While going to open the garage, he saw the defendant coming up the alleyway next to his home. He had lights shining outside of his house, was able to see defendant’s face, and recognized him from the neighborhood as “Bad Face.” On previous occasions, Lamp-kin had spoken to defendant and had asked him not to hang around on the street by Lampkin’s house.
LWhen Lampkin opened his garage door, the defendant approached him and placed a gun, described as a chrome silver, nickel-plated revolver, at the victim’s side. Defendant demanded money and Lampkin promptly gave approximately $11-$12 to the defendant. “Bad Face” told Lampkin that he believed he had more money. When Lampkin denied that he had more money, the defendant put his gun to Lampkin’s head and walked him to his truck where he instructed Lampkin to look through his glove compartment for more money. Lampkin did so, but again told the defendant that he had no more money. “Bad Face” then placed the gun to Lamp-kin’s head and walked him from the garage to the alleyway/yard of Lampkin’s home.
Because the defendant became agitated, Lampkin feared that the defendant was getting ready to shoot him. When Lamp-kin knocked the gun away, the defendant turned, faced Lampkin and started to raise the gun. Lampkin knocked the gun away again and the defendant shot Lampkin in *443 the thumb. The defendant went around Lampkin and shot him a second time, this time in the arm. This bullet broke Lamp-kin’s humerus bone. As Lampkin fell to the ground, the defendant shot him a third time. This bullet entered Lampkin’s side, perforating his large intestine, small intestine, and bladder.
The defendant ran away and Lampkin began to call to his girlfriend, Ella Bryant, who was inside his home. She came to the door but was too afraid to come outside because she feared that the defendant was still in the vicinity. Lampkin told her to call 911, which she did. When the police arrived, Lampkin was able to tell the paramedics that he saw the defendant’s face and that he knew the individual only as “Bad Face.” After the defendant was transported to the hospital, he underwent surgery and nearly died. However, after he was somewhat recovered, he identified the shooter out of a photographic line-up and was also |sable to later identify him in open court. The attack took place between 2:15-3:00 a.m, according to Lamp-kin.

Ella Bryant

Ella Bryant testified she was at Lamp-kin’s home on the night of the robbery and shooting. She initially heard Lampkin come into the house at approximately midnight. She awoke again at 2:00 a.m. and noticed that Lampkin was not in bed with her. A short while later, she heard gunshots outside of the house. Bryant heard Lampkin calling her name from outside of the house. When she looked outside, she did not see him immediately. She called 911 first, then went outside and saw Lampkin lying in the garage on the ground. Lampkin told her that a man named “Bad Face” shot him. Bryant also heard Lampkin tell this to the paramedics. Bryant was certain that all of these events took place after 2:00 a.m.

Wayne Black

Wayne Black testified that he received a phone call from someone at 2:30 a.m. with the news that Lampkin had been shot. When asked if he personally knew “Bad Face,” Black testified that he did not.

Cornell White

Cornell White knew both the defendant and the victim. He learned that Lampkin was telling the police that “Bad Face” shot him. White testified that the defendant was known by this nickname. White was able to identify the defendant as “Bad Face” for both the police before trial and for the jury during trial.

Joseph A. Dews

Shreveport Policeman Joseph A. Dews was dispatched to the shooting scene and arrived between 2:00-3:00 a.m. Dews went to the small alleyway located next to the residence and saw a small pick-up truck parked there. There Lwas also a gate that opened parallel to the alleyway. He looked into the open garage door and saw Lampkin lying on his left side in a pool of blood between the garage and the fence. His head was toward the garage and his feet toward the fence.
In response to Dews’ questions, Lamp-kin responded that he had just come home. As he was parking the truck, a black male approached him and demanded money from him. Specifically, Lampkin told Dews that the defendant produced a gun and said “Give me some of your money.” When asked if he knew the defendant’s name, Lampkin told Dews he did not but stated that he recognized him because the defendant hung out near the Easy Street Church. Lampkin described the defendant as a black male, five foot eleven, weighing approximately one hundred and fifty pounds with a rough texture to his skin. Lampkin also told Dews that his friend Cornell White knew the defendant’s name and knew what he looked like. However, Dews was not able to locate White at the time to ascertain the defendant’s name.

Amy Chrietzbery

A crime scene investigator with the Shreveport Police Department, Amy *444 Chrietzberg, was dispatched to the crime scene at 3:07 a.m. When she arrived, she learned from responding officers that the victim had been shot in the alleyway next to his home and that the truck and other evidence related to the crime were in the alleyway. Lampkin had already been transported to LSU Medical Center. Chrietzberg took the photographs labeled S2-S15. Chrietzberg also found four shells from a .380 caliber gun in the alleyway. A fifth shell was located later.

Richard Thigpen

Shreveport Police Detective Richard Thigpen stated he was called out to investigate this crime at 3:00 a.m. After briefly viewing the crime scene, Thigpen | Bwent to LSUMC to attempt to interview the victim. When he arrived at LSUMC, Officer Dews gave him the name of a possible suspect, Antoine Desmond. Thigpen subsequently learned that Desmond had been incarcerated since January 28, 1998, and was incarcerated on the date of the instant crime.
At approximately 8:00 a.m. on March 16, 1998, Cornell White came into Thigpen’s office and gave Thigpen the name of the defendant Milton as a possible suspect. Thigpen learned that there was an outstanding arrest warrant for the defendant. Thigpen attempted to locate the defendant through defendant’s grandmother who directed Thigpen to the home of defendant’s mother’s.
Thigpen went to the Roosevelt Street house of defendant’s mother and heard loud music coming from inside. He tried to gain entrance into the house by knocking at both the front and back doors but got no response. Thigpen and others then forced their way in by first trying to kick in the front door and then successfully kicking in the back door. They saw a sofa which had been placed across the front door as a barricade.
The defendant was arrested and his mother who was contacted at her place of employment gave the police permission to search her house. The police found a wet stocking cap in the back bedroom of the house. The defendant was booked into CCC. Thigpen constructed a photographic line-up and showed it to Lampkin who was able to pick the defendant out as the person who robbed and shot him.
Thigpen returned to the jail to interview Milton. The following is Thigpen’s account of the defendant’s statement:

Mr. Milton was read his Miranda rights. He did agree to an interview, at which time he denied having any paH in the offense. He stated that he was at a party on Moreau Street which is in Mooretown until late in the morning and that he probably didn’t get home until around 3 o’clock in the morning. He then gave us a list of people who were at this party that could, I guess, serve as an alibi for him.

| fiBased on this list of the defendant, the police interviewed alibi witnesses. In all, the police interviewed seven witnesses in connection with the defendant’s party alibi. After discovering discrepancies in their time frames, Thigpen subsequently attempted to again interview the defendant concerning these discrepancies. The defendant refused the interview.

Michael Price

Shreveport Police Sgt. Michael Price basically corroborated Thigpen’s testimony. Price arrived at the scene at 2:49 a.m. By that time, Lampkin had already been transported to LSUMC.

The Defendant’s Case

James Milton (“James”)

James testified that on the night of March 15,1998, he and the defendant went to a party in Mooretown at the house of a female named Carrie Bates. At approximately 9:00-10:00 p.m., Bates’ sister picked up James and the defendant and brought them to the party. Party attendees included Vontrell Johnson and James’ girlfriend, Rhonda Reliford, who apparently did not get to the party until late. Reliford paged him at about 1:30 a.m. and *445 arrived to pick them up at approximately 2:20 a.m. After Reliford arrived, James drank one more beer and took some photographs (which were placed into evidence).
They left between 2:30-2:40 a.m. They drove Reliford’s friends, LaShonda Owens and Amanda Ford, back to the Riverwood Apartments in Bossier City. Then, they took the defendant to his home on Roosevelt Street in Shreveport where James saw the defendant go onto the porch and open the screen door. He and Reliford then left the house and dropped off Vontrell Johnson, the final occupant of the car. The couple proceeded to Har-rah’s Casino. James’ testimony was they left the defendant’s house a little after 3:00 a.m. and arrived at Harrah’s |7about 3:30 a.m. Although James told the police the defendant was sloppy drunk when they dropped him off, rendering him incapable of committing the instant crimes, James testified at trial that the defendant was not sloppy drunk but had been drinking beer at the party.

Vontrell Johnson

Another party attendee and occupant of Reliford’s car, Vontrell Johnson (nicknamed “Huck”), testified that he was at the party in Mooretown with the defendant and that James brought him to the party. Johnson stated that they arrived there in the daytime and left the party between 1:00-2:00 a.m with Reliford driving and defendant, James, and two other females also in the car. They took the two females home first and then dropped the defendant off at approximately 2:00 a.m. They remained at the curb and saw the defendant go up to his front door like he was going in the house. Then they left and he was dropped off next. They arrived at his home which was one-half mile from the defendant’s house at approximately 2:30 a.m.

Rhonda Reliford

Reliford testified that she is James’ girlfriend. James paged her on March 16, 1998, and asked her to come and pick him up from a party. LaShonda Owens and Amanda Ford were with her when she went to pick up James and the defendant from the party at which she arrived between 1:00-2:00 a.m. Reliford found the defendant (“Rini”), James, “Scooter,” and “Huck” outside of the house. She estimated that they stayed at the party for approximately 15-30 minutes and took some pictures. After they left, she took Owens and Ford home first. It took approximately 15-20 minutes to reach their apart-njents in Bossier City. Reliford returned to Shreveport and dropped the defendant off at his house. After she saw the defendant reach the screen door, she drove off. Following this, she dropped |sJohnson off at his residence which was located approximately 5-10 minutes from the defendant’s house. She and James arrived at Har-rah’s Casino to gamble a little after 3:00 a.m. Since she had to go to work the next morning, she looked at her watch to determine the time because she did not want to go to the casino but instead wanted to return home to sleep.

LaShonda Owens

A friend of Reliford, Owens testified she rode with Reliford and Ford to pick up Reliford’s boyfriend from a party in Shreveport. She recalled that they got out of the car and stayed at the party for 20-30 minutes, but does not remember what time it was. However, in her statement to police, she told the detective that they left her apartment complex at 1:00 a.m. They arrived at the party at 1:15 a.m. and left the party at 1:45 a.m. She got back to her apartment complex between 2:00-2:15 a.m.

Amanda Ford

Ford also testified that she rode with Owens and Reliford to pick up Reliford’s boyfriend. She did not remember the address of the house where the party was located. She estimated that they arrived at the party between 12:30-1:00 a.m. They stayed at the party for 30^15 minutes. They left between 1:45-2:00 a.m. and she got home between 2:00-2:15 a.m.

*446
State’s Rebuttal

Brian Monette

A detective with the felony investigation unit of the Shreveport Police Department, Brian Monette reported the following concerning his interview of LaShonda Owens:
Q. Do you recall what Ms. Owens told you about where she was and what she was doing on the early morning hours of March 16?
A. Yes, sir. She stated that she was at a friend’s apartment.
|ciQ. About what time?
A. She stated it was approximately 1:00 o’clock when her friend’s boyfriend paged and her friend Rhonda then called her boyfriend back and asked them to come and pick them up in Shreveport at
[[Image here]]
Q. And they were in Bossier City at the time?
A. Yes, sir, they were.
Q. What time did she say that she left?
A. She stated it was shortly after 1:00 and that they arrived on Morrow Street at l:50(sic) a.m.
Q. And did she say how long she stayed there?
A. She stated she stayed there approximately thirty minutes or so.
Q. Did she give an approximate time for when she left?
A. Yes, sir. She stated roughly around 1:45 or so.
Q. And after that, she said she went back to Bossier City, right?
A. Yes, sir.
Q. Did she give an approximate time for when she arrived back in Bossier City?
A. Between 2:00 and 2:15.

Richard Thigpen

Detective Thigpen reiterated that James told him that he did not believe that the defendant could have committed the instant crime because defendant was too drunk on the night in question.

Gregory Lampkin

The victim informed the jury that the person who robbed and shot him was wearing a knit cap.

Verdict and Post-Verdict Procedural Background

Following this testimony, the jury reached a verdict of guilty on both the attempted second degree murder and the armed robbery counts. Before the trial | incourt held a sentencing hearing in this matter on December 14, 1998, the state informed the court that it intended to file a habitual offender bill following the sentencing. The victim recounted the injuries he sustained and stated that he had been clinically dead on four occasions during the eight days he was unconscious following the shooting.
Defendant’s parole officers, Julia Lawrence, started her supervision of the defendant on October 9, 1995. The defendant had been released from prison following a sentence for simple burglary and an armed robbery. She characterized the defendant’s behavior on parole as appalling. The defendant’s parole was revoked on September 11, 1996. At that time, Lawrence described the defendant as very violent and belligerent, with abusive behavior. Defendant would not cooperate with the parole rules, was unemployed, associated with a gang and was arrested again on March 30, 1996 for the possession of a firearm by a convicted felon. Lawrence’s notes indicated her belief that the defendant was probably going to be a career criminal.
William Swygart, the defendant’s second parole officer on the simple burglary and armed robbery conviction, supervised the defendant after he was released following the September 11, 1996 revocation of his parole. His parole period was supposed to run from July 26, 1997 until September 23, 1998. The defendant also failed to successfully complete this parole. He was *447 arrested on February 7, 1998 for possession of marijuana and he was arrested again on February 22, 1998 for simple criminal damage to property. Finally, the defendant was arrested and convicted for the instant crime and his parole was automatically revoked.
Regarding the defendant’s behavior during the instant trial, Deputy David Bartlett told the court of the defendant’s violent propensities. Bartlett gave the In defendant several warnings with the shock belt to keep him from being disruptive during the trial. Defendant asked Bartlett if he touched another person while he was being shocked, would the second person also be shocked. The deputy presumed that defendant was talking about his lawyer. Finally, Bartlett testified the defendant was in a holding cell during jury deliberation. When Deputy Danny Schev-ers placed another inmate in the cell with the defendant, the defendant reached up and touched Schevers’ ring. The defendant told Schevers that if he was out on the street, he would take his ring from Schevers. Deputy Schevers confirmed this for the court.
After a thorough consideration of the La.C.Cr.P. art 894.1 factors, the trial court sentenced the defendant to 99 years without the benefit of parole, probation or suspension of sentence on the armed robbery conviction and 50 years hard labor on the attempted second degree murder conviction. The court ordered that these sentences were to run consecutively.
On January 5, 1999, the defendant’s habitual offender hearing was held. Parole Officer Swygart again testified that the defendant had previously been convicted of simple burglary and armed robbery in Red River Parish. The defendant was subsequently convicted of the instant armed robbery. Following the presentation of evidence, the trial court adjudged the defendant a second felony offender, reiterated that he thoroughly considered the La. C.Cr.P. art. 894.1 factors during the original sentencing of the defendant. The trial court vacated those sentences and resen-tenced him, so as to cure the sentence’s non-compliance with La. R.S. 14:27 and 30.1, to 50 years at hard labor without benefit of parole, probation or suspension of sentence on the attempted second degree murder conviction (this was not the subject of the second felony offender bill). The trial judge further resentenced the defendant as a second felony offender on the armed |12robbery conviction to 100 years without benefit of parole, probation or suspension of sentence. Following denial of a motion to reconsider sentence, defendant appealed.
DISCUSSION
Assignment of Error #4: The evidence herein is legally insufficient to sustain appellant’s adjudication as a habitual offender.
The defendant did not brief this assignment of error. Assignments of error which are neither briefed nor argued are considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978).
Assignment of Error # 1: The evidence herein is legally insufficient to sustain appellant’s conviction.
The defendant urged that the verdicts of armed robbery and second degree murder were not supported by the evidence. When the defendant challenges both the sufficiency of the evidence and one or more trial errors, the reviewing court will first review the sufficiency of the evidence, as a failure to satisfy Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) will moot the trial errors. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bullard, 29,662 (La.App.2d Cir.09/24/97), 700 So.2d 1051. The criteri on for evaluating sufficiency of the evidence is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational fact-trier could find that the state proved all elements of *448 the crime beyond a reasonable doubt. Jackson, supra; State v. Clower, 30,745 (La.App.2d Cir.06/24/98), 715 So.2d 101. That standard, initially enunciated in Jackson and now legislatively embodied within La.C.Cr.P. art. 821, is applicable in cases involving both direct and circumstantial evidence. State v. Perry, 612 So.2d 986 (La.App. 2d Cir.1993).
The defendant argued that the state failed to prove that the defendant was the person that committed the instant crimes. Specifically, the defendant points to |1sthe testimony of his alibi witnesses, James Milton, Rhonda Reliford, LaShonda Owens, Amanda Ford and Vontrell Johnson. Defendant contended that the victim, his girlfriend and his friend, Black, all testified that this event occurred between 2:00— 2:30 a.m., while defendant’s alibi witnesses placed him at a party in Mooretown until 2:15 a.m. The defendant also questioned the identification made by Lampkin and the composition of the line-up.
All evidence, both direct and circumstantial, must be sufficient under the Jackson standard to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. State v. Porretto, 468 So.2d 1142 (La.1985); State v. Arrington, 514 So.2d 675 (La.App. 2d Cir.1987); State v. McKnight, 539 So.2d 952 (La.App. 2d Cir. 1989), writ denied, 548 So.2d 322 (La. 1989).
Of course, it is always the function of the jury to assess the credibility and resolve conflicting testimony. State v. Thomas, 609 So.2d 1078 (La.App. 2d Cir. 1992), writ denied, 617 So.2d 905 (La. 1993). Where a trier of fact has made a rational determination, an appellate court should not disturb it. Indeed, in the absence of internal contradiction or irreconcilable conflict with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient support for the requisite factual conclusion. State v. Clower, supra; State v. Thomas, supra; State v. Combs, 600 So.2d 751 (La.App. 2d Cir. 1992), writ denied, 604 So.2d 973 (La. 1992).
Armed robbery is the taking of anything of value belonging to another from the person of another while armed with a dangerous weapon. La. R.S. 14:64. Second degree murder occurs when a killing occurs when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1. The relevant portions of La. R.S. 14:27 define attempt as follows:
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the_Lyaccomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
 Under Jackson v. Virginia, supra, the state bears the burden of negating any reasonable probability of misidentification in cases where the defendant asserts he was not the perpetrator or he remains silent. State v. Powell, 27,959 (La.App.2d Cir.04/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.02/21/97), 688 So.2d 520. Based on the testimony presented at trial, the evidence was sufficient to prove beyond a reasonable doubt that the defendant was guilty of armed robbery and attempted second degree murder. Lamp-kin stated that the area was well lit and that he saw the defendant’s face. Lamp-kin also told the jury that he knew the defendant from around the neighborhood. Although the victim could not give the police the defendant’s real name, he was able to give them the defendant’s nickname and .the name of another person who knew the defendant and could tell the police the defendant’s real name. Further, Lampkin was able to pick the defendant out of a photographic line-up, which the defendant did not challenge until the appeal. The victim was also able to identify him at trial. The defense presented several alibi witnesses at the trial of this matter who gave varying accounts of the times *449 that they left the party and returned home.
The jury had the opportunity to assess the credibility of the witnesses. It is apparent that they found the prosecution’s witnesses more credible than the defendant’s witnesses. This finding should not be disturbed on appeal. Viewing the evidence in the light most favorable to the prosecution, the state proved all the elements of the crime, including defendant’s identity, beyond a reasonable doubt.
Assignment of Error #2: The honorable trial court erred in imposing upon appellant excessive sentence.
Assignment of Error # 3: The honorable trial court erred in denying appellant’s motion to reconsider the sentences imposed.
1 ^Assignment of Error # 5: The honorable trial court erred in failing to comply with the requirements of La.C.Cr.P. art. 894.1 in fashioning appellant’s sentences.
The defendant was sentenced to 100 years at hard labor without benefit of parole, probation or suspension of sentence on the armed robbery conviction, which was the second listed offense in the multiple offender bill. He was finally sentenced to 50 years at hard labor without benefit of parole, probation or suspension of sentence on the attempted second degree murder conviction. The sentences were made to run consecutively by the trial judge.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/2^98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La.C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La.C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29,519 (La.App.2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (La.1988).
b(¡Whether the sentence imposed is too severe depends on the circumstances of the case and the background of the defendant. A sentence violates La. Const, art. 1, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); State v. Bradford, supra. Further, the defendant argues that the trial court should apply the Habitual Offender law, La. R.S. 15:529.1 in such a manner as to render it constitutional, rather than using it to impose an excessive sentence. However, the Habitual Offender law has been held to be constitutional in its entirety; the mandatory minimum sentences provided therein are therefore presumed to be constitutional. State v. Johnson, 97-1906 (La.03/04/98), 709 So.2d 672. The sentencing court may deviate downward only when it finds that the mandatory minimum makes no measurable contribution to acceptable goals of punishment, or is nothing more than a purposeful imposition of pain and suffering and is grossly *450 out of proportion to the severity of the crime. State v. Dorthey, supra. The defendant bears the burden of showing that a deviation beneath the mandatory minimum is warranted. State v. Johnson, supra.
In the original sentencing hearing in this matter, the trial court gave a thorough discourse on the La.C.Cr.P. art. 894.1 factors, as well as its other numerous reasons for imposing the sentences of 99 and 50 years. Additionally, when the trial court resentenced the defendant to 100 and 50 years following the Inhabitual offender conviction, it referred back to the reasons it gave at the original sentencing hearing which are as follows:
The court is required by law to consider the factors under Article 894.1 which I have done. The law states that when a defendant has been convicted of a felony or a misdemeanor the Court should impose imprisonment if any of the following occurs: number one, there is an undue risk that during the period of a suspended sentence or probation the defendant will commit another crime; number two, the defendant is in need of correctional treatment or custodial environment that can best be provided by his commitment to an institution; number three, a lesser sentence would deprecate the seriousness of the defendant’s crime. Of course, all three of those cry out for a substantial penitentiary sentence. 894. IB goes on to state that the following grounds, while not controlling the discretion of the court, shall be accorded weight in its determination of suspension of sentence or probation: number one, the offender’s conduct during the commission of the offense manifested deliberated cruelty to the victim. I would note for the record that during the trial testimony it was clear that Mr. Lampkin was shot once, he was shot a second time and when Mr. Lampkin was on the ground completely helpless, he was shot a third time. As I stated before, there is evidence to suggest that there were actually five rounds fired and not three. Certainly the offender under those circumstances should have known that the victim Mr. Lampkin was particularly vulnerable and could have been killed quite easily. It is clear to me that he intended specifically to kill him. This was actual cruel violence. It resulted in significant permanent injury to Mr. Lampkin. It has resulted in an injury to his family emotionally as well as economic.
There are mitigating factors under Article 894.1 which I will talk about briefly. The defendant did not contemplate that his criminal conduct would cause or threaten serious harm, that is number twenty-three under 894.1. Clearly that is not true. He did have to contemplate that his conduct would cause and threaten harm, serious harm. Number twenty-four, under Article 894.1, considers it to be a mitigating factor if the defendant acted under strong provocation. There is no evidence whatsoever that there was a strong provocation. This was a heinous, outrageous, violent act without provocation at all. Regarding number twenty-five under 894.1, there were obviously no substantial grounds that tend to excuse or justify the conduct. Number twenty-six, the victim certainly did not facilitate in the commission of the offense. Number twenty-seven, Mr. Milton has not compensated and will not compensate the victim in this case for his medical bills. There has never even been an apology. Number twenty-eight refers to a prior history of the offender. And certainly, Mr. Milton has a prior history and it is significant. Number twenty-nine considers it to be a mitigating factor of the criminal conduct is the result of circumstances unlikely to recur. It is my opinion based on what I have heard, just as there | iswere, just as there was an occurrence this morning, just as there (sic) an occurrence last Tuesday with regard to a threat to rob a deputy of his ring, if Mr. Milton got out today, he would commit crimes probably by nightfall. He is unable to respond affir *451 matively to probationary treatment even if I were to give it, which I wouldn’t. And there is no evidence that imprisonment would entail a hardship on himself or his dependants. I do note as a relative mitigating factor that he is young.
The court made a thorough examination of the 894.1 factors and, based thereon, determined a long term of imprisonment would be a proper punishment for the instant crime. For this extremely violent crime, the sentence does not shock this court’s sense of justice and is clearly not excessive.
With regard to the defendant’s claim that consecutive sentences were excessive and not warranted in this case, when two or more convictions arise from the same act or transaction, or constitute parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. La.C.Cr.P. art. 883. It is within a trial court’s discretion to order sentences to run consecutively rather than concurrently. State v. Derry, 516 So.2d 1284 (La.App. 2d Cir.1987), writ denied, 521 So.2d 1168 (La.1988); State v. McCray, 28,531 (La.App.2d Cir.8/21/96), 679 So.2d 543.
Concurrent sentences arising out of a single cause of conduct are not mandatory, State v. Pickett, 628 So.2d 1333 (La. App. 2d Cir.1993), writ denied, 94-0348 (La.05/20/94), 637 So.2d 476; State v. Nelson, 467 So.2d 1159 (La.App. 2d Cir.1985), and consecutive sentences under those cir cumstances are not necessarily excessive. State v. Oriego, 382 So.2d 921 (La.), cert. denied, 449 U.S. 848, 101 S.Ct. 135, 66 L.Ed.2d 58 (1980); State v. Williams, 445 So.2d 1171 (La.1984); State v. Mills, 505 So.2d 933 (La.App. 2d Cir.1987), writ denied, 508 So.2d 65 (La.1987).
]19When consecutive sentences are imposed, the court must state the factors considered and its reasons for the consecutive terms. State v. Green, 614 So.2d 758 (La.App. 2d Cir.1993). A judgment directing that sentences arising from a single course of conduct be served consecutively requires particular justification from the evidence of record. State v. Strother, 606 So.2d 891 (La.App. 2d Cir. 1992), writ denied, 612 So.2d 55 (La.1993); State v. Thompson, 543 So.2d 1077 (La. App. 2d Cir.1989), writ denied, 551 So.2d 1335 (La.1989); State v. Mims, 550 So.2d 760, 765 (La.App. 2d Cir.1989), appeal after remand, 566 So.2d 661 (La.App. 2d Cir.1990), writ denied, 569 So.2d 970 (La. 1990).
The court complied with this last mandate and provided the following lengthy and well-stated explanation for its decision to impose consecutive sentences:
Regarding consecutive versus concurrent sentences, the law says that it is within the trial court’s discretion to order the sentences to run consecutively rather than concurrently. And I have reviewed Article 883, as well as State v. Derry which is found at 516 So.2d 1284, it is a Second Circuit 1987 case. It is not mandatory, of course, that concurrent sentences be issued even if there are multiple convictions arising out of the same bill. State v. Nelson stands for that which is found at 467 So.2d 1159. The appellate courts have deemed consecutive sentences to be appropriate, and they have specifically held that consecutive sentences are not necessarily excessive if the circumstances call for it. State v. Ortego, 382 So.2d 291[921], is one case on point and two recent cases on point involves State of Louisiana v. Roosevelt Smalls, and while I don’t have the So.2d number, I do have the Second Circuit number of 29137KA; and State v. Dale DeWayne George, which has a Second Circuit docket number of 26867KA. Those are both consecutive sentences given by the First Judicial District Court which were deemed to be appropriate by the appellate court and affirmed by the Louisiana Supreme Court in both cases. *452 It is crystal clear to me that Mr. Milton is a violent and antisocial criminal who even at a relatively young age of twenty-two has established himself as a “menace to society” and as a menace to this community. It is my view that his violence has become such a pattern that he has forfeited his right and his privilege to live in Shreveport. It is the intent of this court to send a one-way ticket south to Angola.
lanThus, the trial court clearly and adequately enumerated the factors and reasons to sentence this defendant to consecutive sentences.
DECREE
The convictions and the sentences are affirmed.
AFFIRMED.