785 So.2d 957 (2001)
STATE of Louisiana, Appellee,
v.
Kenny L. McNEAL, Appellant.
No. 34,593-KA.
Court of Appeal of Louisiana, Second Circuit.
April 4, 2001.
*960 Louisiana Appellate Project by J. Wilson Rambo, Monroe, Counsel for Appellant.
Richard Ieyoub, Attorney General, Robert Levy, District Attorney, James L. Piker, Assistant Attorney General, Counsel for Appellee.
Before STEWART, PEATROSS & DREW, JJ.
PEATROSS, J.
Defendant, Kenny L. McNeal, was tried by a jury and found guilty of second degree murder, a violation of La. R.S. 14:30.1.[1] Prior to trial, Defendant had filed a motion to quash/motion to suppress regarding certain inculpatory statements he had made, which motion was denied. Following his conviction, Defendant filed a motion for new trial based on alleged new evidence, which the trial court also denied. Defendant was sentenced to life imprisonment, without benefit of probation, parole or suspension of sentence. He now appeals his conviction and sentence. For the reasons stated herein, Defendant's conviction and sentence are affirmed.

FACTS

The Crime Scene
On December 24, 1994, John Neal was preparing to celebrate Christmas Eve at his parents' home in the Evergreen Community, near Bernice, in Union Parish, located on a road off of the Farmerville Bernice Highway. When the family was unable to contact John's grandfather, Mr. Wesley Smith, by telephone, John went to *961 Mr. Smith's home, which was not far away, to check on him. When John arrived at Mr. Smith's home at approximately 5:15 p.m., he found the front door to Mr. Smith's brick home unlocked. John walked through the house and out the back door toward the well shed, which was adjacent to and to the left of the main house. John saw a light on in the shed and approached the door. Through a hole in the shed door, John saw Mr. Smith lying motionless on the floor.
John immediately left the shed and returned to the house to telephone his father, Marvin Neal, for help. Marvin was Mr. Smith's son-in-law. John looked around the house and nothing appeared to be missing. Mr. Smith's truck and gun were also undisturbed.
When Marvin arrived, he discovered Mr. Smith, in the corner of the shed next to a chest freezer. Mr. Smith appeared to have been beaten to death. His body was face up, with one leg up and bent at the knee. A jug of peas was broken and scattered about, and blood was on the walls, freezer, washer and dryer. Marvin saw the freezer door was propped partially open with a frozen raccoon and he closed it. Mr. Smith, who was 87 at the time of his death, was a licensed fur dealer and also sold raccoon meat. Mr. Smith normally carried a wallet and a large amount of cash. The Union Parish Coroner, Ralph Kelley, however, found no wallet in Mr. Smith's clothing.
Deputy Michael Sewell of the Union Parish Sheriff's Department responded to the call regarding the apparent murder. He met Marvin outside the Smith residence and found Mr. Smith's body inside the shed, which he left undisturbed. Deputy Sewell asked the family members to leave the residence and he secured the scene until the investigators arrived.
Sheriff Bob Buckley asked Jim Churchman, a forensic scientist with the State Police Crime Lab in Baton Rouge, to examine the secured crime scene, which he did on the same day the murder was discovered. Mr. Churchman collected several items of physical evidence for analysis and took photographs and a videotape of the crime scene. Mr. Churchman found the freezer closed. He opened the freezer and collected the base of a broken gallon jar inside the freezer which was spattered with blood. No potential murder weapon was found.[2] Since it was very cold and fingerprints are not as readily left behind in cold weather as in warm weather, only a palm print and few partial latent finger prints were found. The other items examined by Mr. Churchman led to no significant findings.
Dr. George McCormick, an expert in forensic pathology and blood splatter, reviewed the autopsy report and photographs of Mr. Smith's body taken at the crime scene. Dr. McCormick determined that Mr. Smith received two sets of fatal wounds: stab wounds were inflicted to Mr. Smith's neck, two of which severed the carotid artery and the jugular vein; and multiple blunt injuries were inflicted to Mr. Smith's head and face with a heavy object which had both a straight line surface and a right-angle surface. The stab wounds were most probably caused by a knife.[3] Mr. Smith also had defense *962 wounds to his left hand, which was struck at least three times.
Considering the location of Mr. Smith's body in the corner and the blood splatter pattern on both walls behind his body, Dr. McCormick concluded that the blood spatters were consistent with blood that spurted from Mr. Smith's carotid artery and facial wounds, blood flung off the object used to strike Mr. Smith and blood either smeared or transferred by something bloody touching the wall. The blood drops and smears on the freezer were consistent with blood dropped from Mr. Smith and smeared by him as he backed in the corner. Dr. McCormick determined that the stab wounds were probably inflicted first while Mr. Smith was standing facing his attacker, followed by the beating administered while Mr. Smith was in the corner facing forward.

Subsequent Investigation
Charlie Frazier, Chief Deputy of the Union Parish Sheriffs Department, began work on the investigation approximately two days after the murder was committed. He generated a report of his findings, but the report could not be found later, when the first grand jury was empaneled. It was also discovered that the fingerprints taken during the investigation were also missing. Fortunately, the fingerprints had previously been compared and analyzed. There were no matches found with any of the family members or three individuals who were suspects at the time. Defendant was one of the suspects whose fingerprints/palm print were compared.
During the investigation, it was determined that Mr. Smith was last seen alive by Huey Littleton at approximately 2:15 p.m. on the day of the murder. Mr. Littleton had stopped by Mr. Smith's residence to purchase some raccoon meat. He and Mr. Smith went to the shed and Mr. Smith got some packages of meat out of the freezer. Mr. Littleton paid for the meat and left 15 or 20 minutes later.
Jeff Perdue, who lived about two miles past the Smith residence, gave a statement to the sheriffs department shortly after the murder. Mr. Perdue stated he was driving toward the Farmerville-Bernice Highway on his way to visit his family in Bastrop on December 24, 1994. Mr. Perdue remembered driving past Mr. Smith's residence between approximately 3:10 p.m. and 5:30 p.m., when a man backed out of Mr. Smith's driveway immediately in front of him, almost causing a collision. Mr. Perdue was forced to apply his brakes and swerve his truck toward the ditch. Mr. Perdue described the other vehicle as a late model olive green Ford truck with mud grip tires on the back, old chrome Ford hubcaps and round headlights. Mr. Perdue got only a glimpse of the driver, but described him as a black man about his own height with a wide nose, wearing a dark baseball cap and dark clothing. He observed that the driver appeared very nervous or scared because he pulled right back in the driveway so quickly that he almost hit Mr. Smith's fence. Mr. Perdue did not see a passenger in the green truck.
After the near mishap, Mr. Perdue continued past Mr. Smith's residence and watched the green truck back out and turn around behind him. Mr. Perdue kept watching the green truck in his rear view mirror until it turned right onto the Farmerville Bernice Highway and traveled toward Farmerville. Mr. Perdue later gave information to a sketch artist for a composite drawing of the man and the truck. At trial, Mr. Perdue could neither identify Defendant as the driver of the green truck, nor could he rule out Defendant as the driver.

Defendant's Statements
Defendant, who approached law enforcement regarding Mr. Smith's murder of his *963 own volition, gave four different statements to law enforcement officers during the course of the instant murder investigation:
1. An audio tape-recorded telephone statement between Defendant and Deputy Trey Fulton on February 20, 1995;
2. An audio tape-recorded statement given to Deputies David Lenard and Matthew Means on June 28, 1995;
3. An audio tape-recorded statement given to Deputy David Lenard and Sheriff Bob Buckley on June 29, 1995;
4. A video tape-recorded statement given to Sheriff Bob Buckley on June 30, 1995. Assistant District Attorney Shawn Alford, Deputy David Lenard and Deputy Curtis Batton were also present.

February 20, 1995 Statement:
On February 13, 1995, a warrant for simple burglary was issued against Defendant by the Farmerville City Police. At some time between February 13 and 20, 1995, Defendant approached Assistant District Attorney Shawn Alford, who directed Defendant to the Union Parish Sheriffs Office ("UPSO") where Defendant apparently spoke briefly with Deputy Frazier. On February 20, 1995, Deputy Trey Fulton of the UPSO was contacted by Defendant by telephone. An audiotape recording was made of the conversation, which was transcribed, and both the tape and transcript were introduced into evidence at trial. Defendant told Deputy Fulton that he might have information regarding the murder of Mr. Smith. He stated that he was in Arkansas and could come in later, but he wanted to try to get the pending arrest warrant resolved first. The simple burglary related to an incident in which Defendant apparently took a television from his girlfriend's residence in retaliation for her destroying some of his clothing. The following colloquy is taken from the transcript of their conversation:
Fulton: Yeah, well, I mean, tell me, I mean, a little bit about the conversation, or some names or something. I mean, you know, we're gonna, I'm, I know who it is, and you, you know, you know who it is, so, I mean, we're not, I'm not going to screw you any way, okay? I got, I'm holding this warrant right here, right in my hand right now, and, I mean, don't even worry about that.
Defendant: See, I'm, I'm scared if I come back, they, you know what I'm saying, they (sic) going to arrest me.
Fulton: J.D. [Simpson] told me, he said, if you clear this murder up, you don't worry about this warrant, okay? J.D. [Simpson] says he'll take care of that, okay? But what the deal is, I mean, I'm going, you know, we need somebody to pick up. You know who?
Deputy Fulton's references were to Detective J.D. Simpson of the Farmerville Police Department. Defendant then told Deputy Fulton parts of a conversation he overheard which implicated a man by his street name, Mule or Big Nute. Defendant then related the facts surrounding the simple burglary charge made by his girlfriend. He stated that he could come back to Farmerville and get more information, but he was worried about being arrested. Defendant then told Deputy Fulton that he needed the charges taken care of before he could help.
Fulton: Well, I have to, let me talk to J.D. [Simpson] and them, and we'll see if we can hold off on it, okay? That, you know, meaning, they won't pick you up as long as you help us.

*964 * * * *
Fulton: Yeah. Uh, I'm going to have to talk to J.D. [Simpson]. If you call me today about four thirty.
* * * *
Fulton: Can you do that? And I'll tell them, you know, I'll see if they, you know, say, "Yeah, we'll just hold off." As long as you (sic) helping us, though.
Defendant: I'm, I'm going to help.
I....
Fulton: And then in the end, in the long run, when it's all said and done, J.D. [Simpson] can throw this warrant away or whatever.
Then Deputy Fulton accused Defendant of knowing more than he was telling and specifically mentioned a man named Edward Foster. Defendant indicated that he might come into the sheriff's office in the morning. Deputy Fulton told Defendant that Deputy Frazier would want to talk to him when he came in and mentioned the possibility of a polygraph test.
Deputy Fulton did not believe that Defendant was in Arkansas and knew that he was staying at a house in Farmerville. Deputy Fulton immediately went to that house and arrested Defendant. Deputy Fulton testified that he had talked to Detective Simpson regarding the possibility of Detective Simpson contacting the district attorney's office about making the arrest warrant "go away" if Defendant were to help with the Smith murder investigation.
Deputy Fulton denied ever promising Defendant that he would "take care" of the warrant if Defendant would give future statements regarding the Smith murder. A certified copy of the court minutes shows that Defendant pled guilty to misdemeanor theft on March 8, 1995, and was sentenced to six months imprisonment, the balance of the sentence being suspended upon Defendant's serving 20 days in jail, and two years of probation were imposed instead.

June 28, 1995 Audio Statement:
Defendant was apparently released from prison on March 10, 1995, and agreed to attempt to covertly record a conversation between himself and the other suspects for the Smith murder. Defendant's attempt was unsuccessful and law enforcement did not hear from him in any capacity again until he was arrested on June 28, 1995, for simple burglary of an inhabited dwelling.[4]
While in custody, Defendant gave his second statement to Deputies David Lenard and Matthew Means on June 28, 1995. Prior to the recorded statement, Deputy Lenard advised Defendant of his constitutional rights, which Defendant indicated he understood and signed a waiver of rights form. Deputy Lenard denied making any promises to Defendant in exchange for the taped statement and denied using any threats or intimidation. Deputy Lenard also denied suggesting to Defendant what he should say in his statement.
The transcript of the recorded statement of June 28, 1995, further shows that Defendant was aware that the statement was being tape-recorded and that he understood and waived his constitutional rights. In this second statement, Defendant implicated Edward Foster ("Foster") and Earl Nute ("Nute") in the murder. Defendant stated that Foster asked him to take part in a robbery of Mr. Smith and told Defendant that Nute would also be involved. Defendant stated that Foster and Nute came to his apartment on the day of the planned robbery, but he was not *965 able to go with them because he was caring for his children. He related that Foster and Nute were in a green short-bed truck and that he saw Foster and Nute return to the apartment complex, where Nute also lived, an hour or two later. Nute was carrying some black garbage bags which appeared to be very heavy. Defendant stated that he thought the bags contained frozen raccoon carcasses.
Defendant stated that Foster later told him that he did not mean to kill Mr. Smith, but Nute hit Mr. Smith on the head with one of the frozen raccoons. Defendant said that Foster told him that he helped Nute beat the man with a tire tool and that Foster collided with another vehicle with his truck while they were leaving Mr. Smith's yard. Foster warned Defendant not to tell anyone about the crime. At the conclusion of the second statement, Defendant reiterated that no one made any promises or threats to obtain the statement.

June 29, 1995 Audio Statement:
Defendant's third tape-recorded statement was given to Deputy David Lenard and Sheriff Bob Buckley on June 29, 1995. Sheriff Buckley testified that, prior to Defendant's recorded statement, Deputy Lenard advised Defendant of his constitutional rights and he signed a waiver of rights form. Sheriff Buckley denied ever promising anything to Defendant in exchange for the recorded statement.
The transcript of the third recorded statement shows that Defendant was sworn to tell the truth under the penalty of perjury and was advised of and had waived his constitutional rights. Defendant also acknowledged his awareness that the statement was being recorded and that he had not been promised anything in exchange for the statement.
The transcript reflects that Defendant approached Deputy Lenard and Sheriff Buckley regarding providing information about the murder. In the statement, Defendant again implicated Foster as the instigator of a plan to rob Mr. Smith and stated that Nute was to be involved. Each participant in the robbery was to get $200 to $300 of the robbery proceeds. The plan was for Defendant to distract Mr. Smith by purchasing a raccoon while Nute hit Mr. Smith and Foster took Mr. Smith's money. Defendant stated that a week or two before Christmas, he rode to Mr. Smith's residence with Foster and Nute to see where the robbery was to take place. He described the route they took to the Smith residence, stating that they traveled down the Bernice Highway and turned left onto a road at the Evergreen road sign. Defendant also described the Smith residence as a brick house with a shed attached. Defendant reiterated that he was not able to participate in the robbery. Defendant also reiterated his story concerning the return of Foster and Nute to the apartment complex and the heavy black bags and that Foster told him about the murder the next day.
Defendant stated that Foster told him that Nute purchased the raccoon and then hit Mr. Smith on the head and Foster beat him with a tire tool. Defendant also stated that he had heard that Nute was selling raccoons around town and spending a lot of money. At the conclusion of the third recorded statement, Defendant reiterated that he was not promised anything in exchange for the statement and that no threats had been made.

June 30, 1995 Audio and Video Statement:
Prior to the Defendant's videotaped statement, Deputy Frazier questioned him. According to Deputy Frazier, this session was tape-recorded. The audio tape, however, could not be found.
*966 Prior to questioning Defendant, Deputy Frazier advised Defendant of his constitutional rights, which Defendant stated he understood and wanted to give the statement. Deputy Frazier described Defendant as aggressive during this statement in response to Deputy Frazier's attempt to "break" Defendant and get him to tell the whole truth about the murder.
During this questioning, Deputy Frazier showed Defendant an autopsy photograph of Mr. Smith which clearly depicted the damage inflicted on him by the beating. Deputy Frazier did not threaten or harm Defendant, but said something to the effect of "this is what you did." Deputy Frazier said that, during this interrogation, he was the "bad cop," having made Defendant angry; and he then left the room. Deputy Frazier related Defendant's information to Sheriff Buckley, who continued the interrogation as the "good cop." Deputy Frazier admitted having a subsequent discussion with Sheriff Buckley about Sheriff Buckley's reason for not charging Defendant with the murder at that time. Deputy Frazier related that Sheriff Buckley's reason was that Defendant had voluntarily given a statement which had helped in the investigation.
Defendant's videotaped statement was given to Sheriff Buckley on June 30, 1995, after the initial interrogation that day by Deputy Frazier and Sheriff Buckley described above. Ms. Alford, Deputy Lenard and Deputy Curtis Batton were also present. Sheriff Buckley testified he advised Defendant of his constitutional rights and Defendant signed a waiver of rights form. The transcript of the videotaped statement reveals that Defendant was thoroughly advised of his constitutional rights during the recorded statement and he stated that he understood each right and waived those rights. Defendant also stated, under oath, that his statements were made freely and voluntarily and were not the result of force or promise of reward. Further, the following colloquy was exchanged between Defendant and Sheriff Buckley:
Buckley: ... You came up initially and said you wanted to help, and you didn't do really everything you suppose (sic) to, but you were trying.
Defendant: Yes, sir. I was trying to as certain extent. Every time I would get to that point, I ... thing about that man, it would flash back then. The threat I got on me.
Buckley: From who?
Defendant: Edward Foster. Every time I got that far, I stop myself, right there. I wasn't saying nothing. I keep it balled up, and try to push it back out of my mind, but I can't push it back.
Buckley: You made attempts to come and pass on information?
Defendant: Yes, sir. I have.
Buckley: In all these times, has anyone threatened you in anyway, promised you anything for this information?
Defendant: No, sir.
Buckley: You did it on your own?
Defendant: Yes, sir.
Buckley: And no one has promised you anything this time?
Defendant: Correct. It was time for me to let it all go.

In this statement, Defendant reiterated the same information that he had given in his prior statements regarding the planning of the armed robbery. In this last statement, however, Defendant admitted to going with Foster and Nute on the day of the murder. Defendant stated that Foster was driving a green, late model, short-bed Ford truck when Foster and Nute picked him up at his apartment. He further related that the plan had been changed and that he was to be the "lookout." Defendant again described the route *967 which was taken to Mr. Smith's residence as well as describing the residence itself, just as he had done previously.
According to Defendant, when they all arrived at Mr. Smith's residence, Foster and Nute knocked on the door, but no one answered. Defendant waited at the truck while Foster and Nute went around the house to the shed. Defendant said he heard Mr. Smith call for help, so he went to the shed. Defendant described the scene as there being blood everywhere and Mr. Smith was positioned by the freezer in the shed, flat on his back with one leg up in a bent position. He stated that Foster was beating Mr. Smith with a tire tool and Nute was beating him with a pipe. He asked Foster and Nute to stop, but they cursed at him and told him to leave. He then ran out into the yard toward the road. He jumped into the truck as Nute was driving away and Foster pushed him down into the floorboard so that he could not see or be seen. He stated that he did hear them almost hit someone as they were backing out of the driveway.
Defendant described Foster's clothing as a dark shirt and a "toboggan" type hat and Nute's clothing as a regular shirt and a ball cap. He stated that they were covered with blood, and related that Foster said he would burn his clothes. Foster allegedly told Defendant that it was an easy job, as if he had done similar things before. Defendant did not see any of the money that was allegedly taken from Mr. Smith, but was offered some money by Foster after the crime, which he refused.
After the videotaped statement (fourth statement), Sheriff Buckley decided that Defendant should be charged with armed robbery, as opposed to murder, based on the fact that there was an ongoing investigation and the desire for Defendant to continue to cooperate in the murder investigation. He also felt that, since Defendant had voluntarily come forth and given the information, some leniency should be applied.
At Defendant's request, Ms. Alford was also present during the videotaped statement on June 30, 1995. Ms. Alford verified that Defendant was advised of his constitutional rights prior to giving the statement and observed that Defendant's statement was voluntarily given. Based upon the information gleaned during the statement, Ms. Alford filed bills of information against Foster and Nute for aggravated burglary and armed robbery. Ms. Alford later sought a grand jury indictment against Foster and Nute for first degree murder, but no true bill was returned and they were released. After a discussion with Sheriff Buckley, Ms. Alford charged Defendant with aggravated burglary and armed robbery. Ms. Alford stated that Defendant was not charged with the murder at that time because he indicated he was not an active participant in the beating and death of Mr. Smith and it was hoped that Defendant would cooperate in the murder prosecution of Foster and Nute. Ms. Alford denied ever giving any indication to Defendant that he would be given any consideration in exchange for his statements and denied that any threats were ever made to Defendant regarding possible charges.

Defendant's Evidence
At trial, Defendant called Foster as a witness. Foster stated that he did not know Defendant personally; he knew Nute from school, but did not associate with him. Foster denied knowing the victim, Mr. Smith, and denied killing Mr. Smith. Foster stated that he did not own an olive green Ford truck, but admitted borrowing a newer and different green truck from a friend, Thomas Sutton.
Detective Simpson was called by Defendant and testified that Defendant acted as a "snitch" for him, exchanging information for money. Detective Simpson denied *968 ever telling Deputy Fulton that he would talk to the district attorney regarding any arrest warrant.
Lora Andrews, Defendant's former girl friend, also testified on his behalf. She and Defendant have one child together and she stated that they were together all day on the day of the murder, except for the five minutes he was gone to the Chevron store down the street to buy syrup. Ms. Andrews testified that her mother came to her apartment that day and that she and Defendant went to her mother's house that afternoon. She stated that Defendant's mother also came to the apartment and dropped off some presents. She testified that neither Foster nor Nute came to their apartment that day.
On cross-examination, Ms. Andrews acknowledged some inconsistencies between her trial testimony and some of the statements she made to UPSO detectives in her sworn recorded statement of July 18, 1995. She stated that her trial testimony was truthful and that the more time that passed, the better she could remember what happened on that Christmas Eve.
Mellorine McCray, Ms. Andrews' mother, was also called by Defendant. She corroborated Ms. Andrews' testimony, but could not personally account for Defendant's whereabouts after 2:00 p.m. that Christmas Eve. Linda McNeal, Defendant's mother, testified for her son and corroborated Ms. Andrews' testimony about her visit to their apartment on Christmas Eve. She further testified that Defendant did not have a driver's license and was unable to drive.

DISCUSSION
Assignment of Error Number One: The evidence at trial was not sufficient to support a verdict of guilty to the charge of second degree murder.
The proper standard of appellate review for a sufficiency of evidence claim under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333; State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992).
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747. A defendant's confession is direct evidence, for it is an acknowledgment of guilt for which no inference need be drawn. La. R.S. 15:449; State v. Jones, 451 So.2d 35 (La.App. 2d Cir.1984), writ denied, 456 So.2d 171 (La.1984). See also State v. Demease, 33,047 (La.App.2d Cir.4/5/00), 756 So.2d 1264; State v. Giles, 93-0103 (La.App. 4th Cir.6/15/94), 639 So.2d 323, writ denied, 94-1891 (La.12/19/94), 648 So.2d 399 and 94-1897 (La.12/19/94), 648 So.2d 400.
The production of a weapon or other physical evidence is not required as *969 long as the state can establish all of the elements of the crime beyond a reasonable doubt through the testimony of its witnesses. See State v. Wickem, 99-1261 (La. App. 5th Cir.4/12/00), 759 So.2d 961, writ denied, XXXX-XXXX (La.2/16/01), 785 So.2d 839; State v. Lee, 97 1035 (La.App. 5th Cir.2/11/98), 709 So.2d 226; State v. Culverson, 26,874 (La.App.2d Cir.4/5/95), 653 So.2d 1261. An appellate court does not evaluate credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La.App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
In the present case, Defendant was convicted of second degree murder. La. R.S. 14:30.1 provides, in pertinent part, that second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery, ... or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
The record shows that the evidence, viewed in the light most favorable to the prosecution, was sufficient to prove that Defendant committed the second degree murder of Mr. Smith under La. R.S. 14:30.1(1). Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. State v. Morrison, 32,123 (La.App.2d Cir.7/22/99), 743 So.2d 232, writ denied, 99-3514 (La.5/26/00), 762 So.2d 1103; State v. Maxie, 30,877 (La.App.2d Cir.8/19/98), 719 So.2d 104. Specific intent is a state of mind and, as such, need not be proven as a fact, but may be inferred from the circumstances and actions of the accused. State v. Maxie, supra; State v. Morrison, supra. The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Maxie, supra; State v. Morrison, supra.
In State v. Morrison, supra, this court held that the state presented sufficient evidence, based on the severity of the victim's wounds, that the defendant had the requisite specific intent to kill or to inflict great bodily harm to support a second-degree murder conviction. The coroner testified that the victim was shot once in the chest and suffered large, deep lacerations, most of which were to his head and face, that, as a result of being beaten, the victim suffered a fractured nose and skull, hemorrhaging in and around the brain and multiple fractured teeth, and that the head and facial wounds were so severe that the victim could have died from them alone. See also State v. Thompson, 578 So.2d 1151 (La.App. 1st Cir.1991), regarding the severity of the wounds supporting the finding of the intent to cause great bodily harm.
On this record, we find that the State proved that Mr. Smith's killer or killers had the specific intent to kill or to inflict great bodily harm to him. The testimony of Dr. McCormick verifies that two separate fatal wounds were inflicted upon Mr. Smith. Stab wounds were inflicted to his neck and multiple blunt injuries were inflicted to his head and face. Mr. Smith was stabbed three times in the front of his neck, two of which severed his carotid artery and his jugular vein. Further, Mr. Smith was severely beaten about the face and head. The autopsy report indicates that Mr. Smith sustained a potentially fatal *970 wound to his right temple in which his skull was fractured and underlying hemorrhaging and contusions occurred. Aside from this fatal wound, there were multiple lacerations to his face; his nasal bone was fractured, which caused a collapse of the right globe of the eye; his left lower eye lid was lacerated and the underlying left orbital bone was fractured; and there were multiple fractures of his teeth and lower jaw. Dr. McCormick opined that the stab wounds or the wounds sustained by Mr. Smith from the beating were so severe that either was fatal. This testimony clearly supports the trial court's finding that the offender(s) possessed the requisite specific intent to cause death or great bodily harm.
It was further proved that Defendant was a principal to the killing. La. R.S. 14:24, regarding principals, provides that all persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
The record contains direct evidence of Defendant's participation as a principal in the killing of Mr. Smith in the form of Defendant's own voluntary recorded statements to investigators. Defendant's statements contain facts that corroborate information gathered during the investigation and indicate the reliability of Defendant's statements. For example, Defendant's description of the bloody crime scene, the position of Mr. Smith's body, including the raised position of Mr. Smith's leg, and the near collision upon leaving Mr. Smith's yard were all accurate facts that could be known only by persons involved in the crime or its investigation. These statements, viewed in the light most favorable to the prosecution, show beyond a reasonable doubt that Defendant was involved in the commission of the murder, even though he did not admit that he directly committed the murder. Defendant's role in the murder, according to his fourth and last recorded statement, was to be the "look-out" for Foster and Nute; and, having acted as such, Defendant aided and abetted in the commission of the resulting murder.
In any event, a finding of intent to kill or inflict great bodily harm is unnecessary when the human being is killed and the offender is engaged in the perpetration or attempted perpetration of armed robbery or simple robbery. La. R.S. 14:30.1(A). Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64(A). A dangerous weapon includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm. La. R.S. 14:2(3). A single witness' testimony, if believed by the jury, may prove the use of a dangerous weapon, even if the weapon was never recovered. State v. Adams, 30,815 (La.App.2d Cir.6/24/98), 715 So.2d 118, writ denied, 98-2031 (La.3/19/99), 739 So.2d 774; State v. Culverson, supra; State v. Marshall, 479 So.2d 598 (La.App. 1st Cir.1985).
La. R.S. 14:27(A), defining attempt, provides that any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object, is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. To convict of attempted armed robbery, there must be sufficient evidence *971 to establish the intent to take something of value, even though the act of taking need not be established. La. R.S. 14:27(A); La. R.S. 14:64(A); State v. Stone, 615 So.2d 38 (La.App. 3rd Cir.1993), writ denied, 623 So.2d 1302 (La.1993). See also State v. Trepagnier, 97-2427 (La.App. 4th Cir.9/15/99), 744 So.2d 181.
Again, Defendant has supplied direct evidence of the attempted armed robbery of Mr. Smith and his own participation as a principal in the attempted armed robbery with his own inculpatory statements. In Defendant's last two statements, he admitted that he was to play a role in the robbery. In the June 29, 1995 statement, Defendant admitted riding with Foster and Nute to look at Mr. Smith's residence, where the planned robbery was to take place. Also in that statement, Defendant related that the plan was for him to distract Mr. Smith with the purchase of a raccoon. In the last statement, given June 30, 1995, Defendant admitted acting as the "look-out" for Foster and Nute while they beat and robbed Mr. Smith.
The direct evidence supplied in Defendant's statements supports a finding of sufficient evidence of the attempted armed robbery of Mr. Smith. Although it was never proved by direct evidence, or even strong circumstantial evidence, that something of value was actually taken from Mr. Smith, Defendant's statements clearly show that the plan was for the offenders to hit Mr. Smith over the head and take money from his person and that they attempted the plan. Defendant's statements prove that the offenders actively desired the consequences of their actions and, therefore, had the specific intent to commit the armed robbery of Mr. Smith. Defendant's statements also show that the offenders did acts for the purpose of, and tending directly toward, accomplishing the armed robbery, and were, therefore, guilty of an attempt to commit the armed robbery. It is immaterial in an attempted armed robbery whether, under the circumstances, the offenders actually accomplished their purpose of taking something of value (money) from Mr. Smith's person. La. R.S. 14:27(A); La. R.S. 14:64(A); State v. Stone, supra; State v. Trepagnier, supra. Also, the direct evidence in the record of the severity of the wounds is sufficient to prove that the offense was committed while the offenders were armed with a dangerous weapon.
The same direct evidence, viewed in the light most favorable to the prosecution, is sufficient to prove that Defendant was involved in the commission of the attempted armed robbery, whether present or absent during the actual crime, and was, therefore, a principal to attempted armed robbery of the murder victim. Consequently, the evidence in the record is sufficient to support Defendant's conviction of second degree murder, even without a showing of specific intent to kill or cause great bodily harm. This assignment of error, therefore, is without merit.
Assignment of Error Number Two: The trial court erred in denying Defendant's Motion for New Trial.
Defendant addresses this assignment under the section of his brief regarding the sufficiency of the evidence. The totality of Defendant's argument is that, on the basis of the insufficiency of the evidence, the case should be remanded for a new trial or a judgment of acquittal should be entered. A mere statement of an assignment of error in a brief does not, however, constitute briefing of the assignment; and, therefore, the assignment is deemed abandoned. State v. Williams, 632 So.2d 351 (La.App. 1st Cir.1993), writ denied, 94-1009 (La.9/2/94), 643 So.2d 139; *972 State v. Toney, 26,711 (La.App.2d Cir.3/1/95), 651 So.2d 387.
Out of an abundance of caution, we will, however, briefly address this assignment. A post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty. La.C.Cr.P. art. 821. La. C.Cr.P. art. 851 provides that a new trial shall be granted when the court's ruling on a written motion or an objection made during the proceedings shows prejudicial error.
Defendant appears to have confused a motion for new trial with a motion for post-verdict judgment of acquittal. He fails to argue that the trial court committed any particular erroneous ruling which would entitle him to a new trial. Also, the record does not reflect that Defendant filed a motion for post-verdict judgment of acquittal with the trial court requesting that the trial court review the sufficiency of the evidence upon which the jury based the conviction, prior to sentencing, as required by La.C.Cr.P. art. 821. In any event, as previously discussed under Defendant's first assignment of error, the evidence presented was sufficient to support Defendant's conviction. Defendant also has not argued under this assignment of error that any trial court's ruling on a written motion or an objection made during the proceedings showed prejudicial error. Defendant, therefore, has not shown that the trial court abused its discretion in denying Defendant's motion for a new trial. This assignment of error lacks merit.
Assignment of Error Number Three: The trial court erred in denying Defendant's Motion to Quash or in the alternative Motion to Suppress filed to prohibit the introduction of statements made by Defendant.
It is Defendant's assertion that his statements were involuntary due to promises made by Sheriff Buckley that Defendant would not be charged with murder if he gave a statement. He asserts that the evidence was contradictory regarding whether such promises were made, citing the testimony of Deputy Frazier. Defendant contends that the trial court's ruling that the statements were admissible was erroneous. Defendant urges that, without the admission of his statements into evidence, there was insufficient evidence to uphold his conviction.
The State contends to the contrary, however, that Defendant repeatedly stated that he was not threatened and no promises were made in exchange for his statements. Further, it was Defendant who approached law enforcement personnel with alleged information regarding the murder of Mr. Smith.
Generally, before a confession may be admitted into evidence, the state has the burden of affirmatively showing that it was made freely and voluntarily and not under the influence of fear, duress, intimidation, menace, threats, inducements, or promises. La. R.S. 15:451; La. C.Cr.P. art. 703; State v. Simmons, 443 So.2d 512 (La.1983); State v. West, 408 So.2d 1302 (La.1982); State v. Dewey, 408 So.2d 1255 (La.1982). The state must specifically rebut a defendant's allegations of misconduct. State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160; State v. Vessell, 450 So.2d 938 (La.1984). Furthermore, if the statement was made during custodial interrogation, the state must show that the defendant was advised of his constitutional rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Petterway, 403 So.2d 1157 (La.1981); State v. Sonnier, 379 So.2d 1336 (La.1979).
The admissibility of a confession is a question for the trial judge, whose conclusions on the credibility and weight of *973 testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980); State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
Defendant alleges that all of his statements were made in exchange for promises by Deputy Fulton, Ms. Alford and Sheriff Buckley that he would not be charged with the crime. As to Defendant's first recorded statement, which was a non-custodial recorded telephone conversation initiated by Defendant, the State affirmatively showed by the testimony of Deputy Fulton that Defendant's statement was not induced by any promise that charges would be dropped. Detective Simpson's testimony also supports the conclusion that no promises were made to Defendant in exchange for his statement. By this testimony, the State affirmatively showed that Defendant's recorded telephone statement was made freely and voluntarily and not under the influence of inducements or promises, and specifically rebutted Defendant's allegations of misconduct. La. R.S. 15:451; La.C.Cr.P. art. 703; State v. Simmons, supra; State v. West, supra; State v. Dewey, supra. See also State v. Gradley, supra; State v. Vessell, supra.
This statement was non-custodial; and, therefore, the State is not required to prove that Defendant was given his Miranda rights. Miranda v. Arizona, supra; State v. Petterway, supra; State v. Sonnier, supra. The trial court's determination of the credibility and weight of the testimony will not be overturned on appeal. State v. Jackson, supra; State v. Thibodeaux, supra.
The record clearly supports the trial court's ruling that the latter three statements were each given after Defendant was advised of his Miranda rights, both orally and in writing, and that his statements were given freely and voluntarily, without any improper influence, promise or inducement. Particularly, Sheriff Buckley, Deputy Lenard, Assistant District Attorney Alford and Deputy Frazier all verified that no threats or promises were made to Defendant in exchange for his statements. Further, Defendant stated himself during the recorded statements that he had not been threatened or promised anything to induce him to give the statements. The only support for Defendant's claim that the statements were involuntary is his own, self-serving testimony, which is contradictory to prior sworn testimony before the grand jury. The trial court's ruling was clearly a credibility determination which will not be overturned on appeal. State v. Jackson, supra; State v. Thibodeaux, supra. This assignment, therefore, is without merit.
Assignment of Error Number Four: The trial court erred in commenting on the evidence while giving jury instructions.
Defendant failed to brief this assignment of error in both the original and supplemental briefs. Assignments of error which are neither briefed nor argued are considered abandoned. URCA Rule 2-12.4; State v. Schwartz, 354 So.2d 1332 (La.1978); State v. Kotwitz, 549 So.2d 351 (La.App. 2d Cir.1989), writs denied, 558 So.2d 1123 (La.1990).
Assignment of Error Number Five: The trial court erred in imposing an excessive sentence on Defendant.
Assignment of Error Number Six: The trial court erred in failing to adequately comply with the requirements of La. C.Cr.P. art. 894.1 in fashioning Defendant's sentence.
These assignments of error are related and are, therefore, discussed together. *974 Defendant argues in his supplemental brief that the mandatory sentence of life imprisonment is unconstitutionally excessive as applied to him. He also argues that a remand is necessary because the trial court failed to sufficiently articulate a factual basis for the sentence imposed, as required by La.C.Cr.P. art. 894.1. Finally, Defendant contends that the trial court should have ordered a pre-sentence investigation report.
The record does not reflect that Defendant filed a timely motion to reconsider sentence. La.C.Cr.P. art. 881.1 precludes Defendant from presenting arguments to the court of appeal which were not presented to the trial court. When a defendant fails to file a La.C.Cr.P. art. 881.1 motion to reconsider sentence, the appellate court's review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims, 619 So.2d 1059 (La.1993); State v. Duncan, 30,453 (La.App.2d Cir.2/25/98), 707 So.2d 164. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, 603 So.2d 739 (La.1992).
Upon sentencing Defendant, the trial court stated its sentencing considerations in open court. These sentencing considerations reflected the following aggravating circumstances: the offender's conduct during the commission of the offense manifested deliberate cruelty to the victim; the offender knew or should have known that the victim was particularly vulnerable due to advanced age; the offender's use of threats or actual violence; and the offender's use of a dangerous weapon. No mitigating factors were noted.
A review of the record does not reflect that Defendant's life sentence was illegal, or that it was grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato, supra. The crime committed upon Mr. Smith was coldly calculated and plotted in advance as an easy way to get some fast cash. The medical evidence, photographs and testimony contained in the record show that the murder of the elderly Mr. Smith was particularly heinous, vicious and brutal. Two distinct types of fatal injuries were inflicted upon Mr. Smith. One can only imagine Mr. Smith's horror as he attempted to defend himself with his bare hands. The anguish suffered by Mr. Smith's family at finding Mr. Smith's slashed, bludgeoned and blood-bathed body on Christmas Eve was made apparent when, years after the crime, Mr. Smith's son-in-law found it hard to compose himself in order to testify at Defendant's trial. A life sentence for such an offense is hardly disproportionate or shocking to the sense of justice. This assignment of error is without merit.
Assignment of Error Number Seven: The trial court failed to secure a waiver of the delay set forth in La.C.Cr.P. art. 873 from Defendant prior to the imposition of sentence.
In his supplemental brief, Defendant notes that, subsequent to his trial and conviction, he filed a motion for new trial. The record shows that, on November 4, 1999, a hearing was held on the motion for new trial; and the motion was denied. Defendant was sentenced that same day to the mandatory sentence of life imprisonment without benefit of parole, probation or suspension of sentence. Defendant complains that the trial court sentenced him without waiting the requisite 24 hours and without his express waiver of the delay, as required by La.C.Cr.P. art. 873. He asserts that a remand is warranted on this basis.
*975 The mandatory sentence for whoever commits second degree murder is life imprisonment without benefit of parole, probation or suspension of sentence. La. R.S. 14:30.1(B). La.C.Cr.P. art. 873 provides:
If a defendant is convicted of a felony, at least three days shall elapse between conviction and sentence. If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.
The trial judge is required to wait 24 hours before imposing sentence after denying a defendant's motion for new trial unless the defendant waives such delay. State v. Williams, 310 So.2d 513 (La.1975). Such error is discoverable by mere inspection of the pleadings and proceedings and without inspection of the evidence. State v. Taylor, 349 So.2d 1245 (La.1977). This court, however, held in State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, XXXX-XXXX (La.4/7/00), 759 So.2d 92, that the failure to wait 24 hours after the denial of a new trial motion before imposing a life sentence for second-degree murder was, at most, harmless error, where the life sentence was mandatory. See also State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
We find, therefore, that, since Defendant was sentenced to the mandatory sentence of life imprisonment in the instant case, the failure to wait the 24 hours after the denial of the motion for new trial was harmless error. This argument is without merit.

CONCLUSION
For the foregoing reasons, the conviction of, and sentence imposed on, Defendant, Kenny L. McNeal, are affirmed.
AFFIRMED.
NOTES
[1] Defendant was initially charged with armed robbery by the Union Parish District Attorney's Office. In January 1996, Defendant was indicted for second degree murder by the Attorney General's Office which had taken over the prosecution of the case. The Attorney General's Office stepped in because Shawn Alford, an Assistant District Attorney with Union Parish, had become a witness in the case regarding one of Defendant's statements.
[2] He did not collect a metal file found at the scene, which had a drop of blood on the tip, because it was not a surface from which a good fingerprint could be obtained and was obviously not used as a weapon because of the small amount of blood it contained.
[3] On cross-examination, Dr. McCormick expressed an opinion that, if the metal file found at the scene had been used to stab Mr. Smith, the file would have been at least partially covered in blood. The file had only one drop of blood on its end.
[4] Defendant apparently stole a 19" television from a neighbor.