920 So.2d 941 (2006)
STATE of Louisiana, Appellee
v.
Patrick JONES, Appellant.
No. 40,652-KA.
Court of Appeal of Louisiana, Second Circuit.
January 25, 2006.
*943 Paula Corley Marx, W. Jarred Franklin, Louisiana Appellate Project, for Appellant.
J. Schuyler Marvin, District Attorney, Melissa Sugar, John M. Lawrence, Assistant District Attorneys, for Appellee.
Before STEWART, GASKINS and LOLLEY, JJ.
GASKINS, J.
The defendant, Patrick Jones, was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. The defendant appeals. We affirm his conviction and sentence.

FACTS
In the early hours of August 9, 2003, Bossier City police responded to a report of gunshots at a bar called Club Dallas. A trail of blood led officers to an area near the club where they found the victim, Johnny Carley, Jr., a/k/a Jo-Jo, "in a position almost like he was hiding." Emergency personnel were unable to revive him. An autopsy determined that the victim had sustained three gunshot wounds and a probable gunshot graze to his shoulder. One of the bullets severed an artery in the victim's leg, causing him to quickly bleed to death.
The police later transported about 50 people from the bar and its parking lot to the police station for questioning. The officers also searched the bar and its patrons for weapons. Three weapons were found, but none was determined to be the murder weapon.
Following the investigation, during which at least two people gave statements implicating the defendant, Patrick Jones, a/k/a Sweet Pea, as the shooter, the police obtained an arrest warrant and impounded what was believed to be the getaway vehicle, a 1995 gray Mitsubishi Galant owned by the defendant's girlfriend. The defendant was subsequently arrested in Dallas.
Following a jury trial, the defendant was convicted as charged of second degree murder and sentenced to life imprisonment without parole, probation or suspension of sentence. His motions for new trial and for post-verdict judgment of acquittal were denied.

SUFFICIENCY OF EVIDENCE
In this assignment of error, the defendant argues that the evidence was insufficient to convict him because several of the witnesses asserted that they had been "coerced" into giving false testimony and that one had made a deal with the state that cast doubt upon his veracity.

Law
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle *944 to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 1998-2723 (La.2/5/99), 737 So.2d 747.
A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App.2d Cir.8/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, XXXX-XXXX (La.11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. White, 28,095 (La.App.2d Cir.5/8/96), 674 So.2d 1018, writs denied, 96-1459 (La.11/15/96), 682 So.2d 760, XXXX-XXXX (La.6/26/98), 719 So.2d 1048.
Second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1; State v. Ellis, 28,282 (La.App.2d Cir.6/26/96), 677 So.2d 617, writ denied, XXXX-XXXX (La.2/21/97), 688 So.2d 521.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, XXXX-XXXX (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Brooks, 36,855 (La.App.2d Cir.3/5/03), 839 So.2d 1075, writ denied, XXXX-XXXX (La.11/7/03), 857 So.2d 517; State v. Dooley, 38,763 (La.App.2d Cir.9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.

Testimony
At trial, Tracy Summage, a friend of the defendant, testified that he saw the defendant leave the bar parking lot prior to the shooting with a man named Raymond. He further testified that he was coerced into giving a written statement to the police that he saw the defendant shoot at the victim four times outside the bar and then flee with his girlfriend in a gray Galant. He stated that the police threatened to revoke his parole.
Captain Bill Lott, the commander of the investigative divisions and a police chaplain, testified that he had known Summage for 20 years through criminal investigations, that he had arrested him several times, and that he had even recommended *945 Summage for a job after his release from prison. After the shooting at Club Dallas, Summage came to see him and gave him a written statement that he saw the defendant shoot the victim four times and then leave the scene in a gray or silver Galant.[1] However, Summage adamantly refused to give a tape-recorded statement because he was afraid that he would be killed. Sergeant James Stewart, the supervisor of the Bossier City Police Department's violent crimes unit, testified that he was present when Lott interviewed Summage. He verified that Summage wrote the statement identifying the defendant as the shooter without coercion or coaching and that he said that he was afraid for himself and his family.
Captain Lott also testified that at the conclusion of Summage's trial testimony, there was clapping in the hallway when Summage emerged from the courtroom. Lott then heard someone in the hallway outside the courtroom call Summage a "snitch" and declare that they would get a copy of the transcript of his testimony to find out what he said in court. The defense presented the testimony of Tyrone Powell that he called Summage a snitch as a joke and that he didn't even know what a snitch was. He testified that he defined a snitch as someone who goes to jail repeatedly. As to the transcript, he said he was "just talking" and didn't really want a copy. Summage testified that Powell was joking when he called him a snitch. He first said he heard clapping when he left the courtroom, then stated that he didn't recall it.
Jamorris Durham testified that he was at the bar on the night of the shooting but denied being a witness. He stated that detectives offered to pay him for a statement. Although he later gave a taped statement in which he identified the defendant as the shooter, he testified that the police turned the recorder on and off and told him what to say. The taped statement was played for the jury. In exchange for his statement, he stated that he was released from jail on his own recognizance on charges of unauthorized use of a movable and drug possession. He also asserted that the prosecutor threatened him with perjury and obstruction charges. Although he denied being afraid, Durham "[pled] the Fifth" when asked the identity of the "people on the street" who said that witnesses would be killed if they testified. He then said these people were "too many people to remember."
A patrol officer who transported Durham in a police car when he was picked up on a material witness warrant testified. According to her, Durham told her that he saw the shooting, that the defendant was the shooter, that he was scared to testify because the defendant was getting people to come after the witnesses, and that he had even been shot at by someone. Although there was some interference, a mobile video system in the officer's patrol car recorded most of this conversation, and the recording was played for the jury.
Jeremy Campbell testified that he was at the bar on the night of the shooting in violation of his parole conditions. He stated that he was coerced by a detective and his parole officer into making a false statement identifying the defendant as the shooter and stating that the defendant left the scene with a girl after the shooting. However, Shane Patrick McWilliams, a detective with the violent crimes unit, testified that Campbell told him that he witnessed an altercation between the defendant and the victim. He then saw the defendant fire several shots at the victim, who ran from the defendant. According *946 to McWilliams, Campbell said he was afraid to give a statement for fear of retaliation.
Albert Gober testified that he knew both the defendant and the victim and that he was at the bar at the time of the shooting. He saw the defendant shoot the victim twice. The victim fell, got up and ran. Both the victim and the defendant ran past him. Gober then heard more shots. Gober admitted fearing for his life and those of his family. In fact, he stated that he contacted two relatives prior to his testimony and advised them to leave town immediately. Gober also admitted that he had made an agreement with the state whereby pending charges against him and his girlfriend would be dismissed if he testified truthfully and in accordance with the statement he gave to the police.
LaToria Cosby testified that at the time of the victim's murder, she had been the defendant's girlfriend for about four years. Although she admitted that she and the defendant went to the club in her car on the night of the shooting, she testified that he walked off and left her in the parking lot. According to her, he left with a friend named Raymond in a different car before the shooting. She was with him in Dallas when he was arrested for the victim's murder. Even though her car was impounded by the police shortly after the murder, she admitted that she had never retrieved it and that it remained in police custody at the time of trial, almost a year and a half later. She also conceded that she had not contacted the police to tell them that the defendant left before the shooting. She testified that she loved the defendant and would do "pretty much" anything for him.

Discussion
The defendant argues that the evidence was insufficient to convict him because of the contradictory statements of the state's witnesses and a lack of physical evidence.
Gober testified that he saw the defendant shoot the victim several times. The jury was well aware that he was testifying pursuant to an agreement with the state. The state also put on other witnesses who had previously given statements inculpating the defendant and expressing fear of him. At trial, when faced with the defendant, these witnesses changed their testimony to either exculpate the defendant or to deny firsthand knowledge of the offense. These witnesses were then impeached with their previous statements; however, the out-of-court statements used to impeach them were not substantive evidence of the defendant's guilt. The resolution of this conflicting testimony depended upon a determination of the credibility of the witnesses, and the matter was one of the weight of the evidence, not its sufficiency. One credible witness was all that was necessary to carry the state's burden of proof. The trial testimony of the impeached witnesses, which was favorable to the defendant, was apparently not believed by the jury while Gober's testimony was found to be credible. This credibility evaluation was well within the province of the trier of fact, and should not be disturbed on appeal.
As to the physical evidence, Gober's testimony and the statements made by other witnesses during the investigation that the victim ran from the defendant are consistent with the testimony of the coroner. He testified that the victim's bullet wounds indicated that he was running from the shooter.
The evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to reasonably conclude that all of the elements of second degree murder were proved beyond a reasonable doubt. The testimony of Gober is *947 sufficient to prove that the defendant fired several shots at the victim, actions indicative of the defendant's specific intent to kill or inflict great bodily harm upon the victim. This court must defer to the jury's decision to accept or reject the testimony of a witness in whole or in part.
This assignment is without merit.

MISTRIAL
The defendant contends that in closing arguments the prosecutor made a prohibited reference to the defendant's failure to testify at trial and that a mistrial should have been ordered.
The prosecutor made the following comments during closing arguments:
And the judge is going to instruct you on the law. He's going to tell you a lot of things, but there's a couple of things I wanted to point out [to] you.... "Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances that may be considered." So, if a person avoids apprehension or talking to the police and flees and leaves and don't  won't give a statement  They found him in Texas. He was at that bar that night. If he didn't do it, why doesn't he go give a statement to the police? Because he fled. He hid. He avoided apprehension. And that's something that you're to consider as consciousness of guilt.
The record shows the trial court had asked that each side withhold objections until the closing statements were completed. When both sides had finished giving their closing arguments, the trial court then asked if either side had an objection or motion. Both the state and defense counsel said that they did not. However, after the jury began deliberating, the defense attorney made a motion for a mistrial because the prosecutor in closing "made reference or drew an inference to the fact that the defendant did not testify or did not at least give a statement by saying that he had traveled to Dallas and somehow infer  and somehow inferred that he had attempted to elude the police and elude giving a statement." The trial court denied the motion for mistrial. When the issue was raised in the defendant's motion for new trial, the trial court denied that motion also.
The state argues that by waiting until the jury had already begun its deliberation to object to the statement made by the prosecutor in her closing arguments, the defense waived its right to any remedy. The state further argues that La. C. Cr. P. art. 770 does not apply to references of post-arrest silence and that although La. C. Cr. P. art. 771 may apply, the defense did not seek an admonition.
The prosecutor's reference to the defendant's post-arrest silence falls under the provisions of La. C. Cr. P. art. 771, which provides:
In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:
(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or
(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark *948 or comment is within the scope of Article 770.
In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.
A brief reference to a defendant's post-arrest silence does not mandate a mistrial or reversal when the trial as a whole was fairly conducted, the proof of guilt is strong, and the prosecution made no use of the silence for impeachment purposes. State v. Williams, 04-1309 (La. App. 5th Cir.4/26/05), 902 So.2d 485.
A mistrial is a drastic remedy and, except in circumstances where a mistrial is mandatory, is warranted only when a trial error results in substantial prejudice to the defendant, depriving him of a reasonable expectation of a fair trial. State v. Bonner, 39,187 (La.App.2d Cir.12/22/04), 895 So.2d 1.
The determination as to whether a mistrial should be granted under La. C. Cr. P. art. 771 lies within the sound discretion of the trial judge, and denial of a motion for mistrial will not be disturbed on appeal absent an abuse of that discretion. Bonner, supra.
The defendant did not make a timely objection or request an admonition. (By the time he raised the issue, the jury was already deliberating.) The record shows that by the time the prosecutor's statement was made during closing argument, the jury had already heard testimony regarding the defendant's role in the shooting, as well as the fact that he did indeed flee the area. Further, the instructions to the jury, given soon after the statement was made, included language that "[t]he defendant is not required to testify or call any witnesses or to produce any evidence." A review of the prosecutor's comments made in the context of how evidence of flight could be interpreted does not indicate that this one statement would have had great bearing on the jury's decision.
This assignment of error lacks merit.

EXCESSIVE SENTENCE
The defendant argues that imposition of the mandatory sentence of life imprisonment was "grossly disproportionate to the crime allegedly committed" and that "[n]othing in the record indicates such a sentence is necessary to avoid further criminal activity by the defendant or damage to society."
The trial court did not state any reasons for imposing the mandatory sentence and was not required to do so. State v. Koon, 31,177 (La.App.2d Cir.2/24/99), 730 So.2d 503; State v. Rose, 606 So.2d 845 (La.App. 2d Cir.1992). The defendant has not listed any facts to warrant a departure from the legislatively mandated life sentence. Information in the PSI shows that this defendant's criminal history includes four prior felonies. Thus, based on this record which shows the defendant shot an unarmed man who did nothing to provoke the attack, a life sentence does not shock the sense of justice. This record shows no abuse of the trial court's discretion in sentencing this particular defendant to life imprisonment.
This assignment lacks merit.

ERROR PATENT
The trial court failed to wait 24 hours to sentence the defendant after ruling on the motions for new trial and post-verdict judgment of acquittal, and no waiver was given. La. C. Cr. P. art. 873. However, since the defendant was sentenced to the mandatory sentence of life imprisonment, the failure to wait the 24 hours after the denial of the motion for *949 new trial was harmless error. State v. McNeal, 34,593 (La.App.2d Cir.4/4/01), 785 So.2d 957.

CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Lott testified that the police learned that the car belonged to the defendant's girlfriend.